[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 16, 2008
THOMAS K. KAHN
CLERK

No. 07-12849
Non-Argument Calendar

_____

D. C. Docket No. 06-00011-CR-01-WCO-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

OSCAR RENE DIAZ,
a.k.a. Oscar Diaz,
RODRIGO RAMIREZ-CONTRERAS,
a.k.a. Rodrigo Contreras Ramirez,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(May 16, 2008)**

Before ANDERSON, HULL and KRAVITCH, Circuit Judges.

PER CURIAM:

Oscar Diaz and Rodrigo Ramirez-Contreras separately appeal their convictions and sentences for possession with intent to distribute cocaine and conspiracy to do so, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Ramirez-Contreras also appeals his conviction for possessing a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c).[1] After a careful review of the briefs and the record, we affirm.

**I.**

The first claim of error is raised by Diaz, who challenges the denial of a motion to suppress evidence from a police search of a business called One-Stop Construction. When considering a motion to suppress, we review the district court's findings of fact for clear error, but its application of law to fact, including the ultimate decision about whether to suppress, is reviewed de novo. United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000).

The disputed search was of One-Stop Construction. One-Stop was located in a business complex and, according to the government's evidence, shared a common loading dock with at least two other tenants, BAB Steering Hydraulics and Ambit Corporation. The other tenants believed One-Stop to be suspicious.

---

[1] Diaz was also indicted and tried on this charge, but was acquitted.

One tenant called the police and reported (i) that One-Stop received large shipments of tile, but never sold any tile or undertook any tile contracting, and (ii) no customers or other members of the public ever seemed to frequent One-Stop, and even its apparent owner, Diaz, was seldom present. BAB Steering and Ambit both gave their consent to law enforcement to search the loading dock, and gave the investigating officer, Jeffrey Shull, a key.

Shull also contacted Metro Rentals, which rented forklifts to One-Stop. Metro Rentals reported that Diaz wanted the rental forklifts delivered outside, rather than inside, the One-Stop premises, a demand Metro Rentals thought unusual and suspicious. Shull asked Metro Rentals to contact him the next time One-Stop rented a forklift, which it did on January 20, 2006.

After this report from Metro Rentals, the local sheriff's office began surveillance of One-Stop. On January 22, 2006, Shull was informed that a tractor-trailer had arrived at One-Stop, along with Diaz and Ramirez-Contreras in a separate vehicle. The tractor trailer was initially brought to the loading dock, whereupon the surveilling officers heard the sounds of heavy machinery; the truck was then moved to the parking lot.

Without obtaining a warrant, Shull and other law enforcement officers arrived at One-Stop. They first directed a drug-sniffing dog to sniff the back of the

3

tractor-trailer, which by that point had been moved to the public parking lot. The dog alerted them that drugs had been present in the truck. Officers then entered the loading dock. They immediately encountered Ramirez-Contreras, who emerged into the common loading dock from a door connecting the loading dock with One-Stop's premises. The officers identified themselves, and upon being asked, Ramirez-Contreras stated he had a gun. He was then detained. Ramirez-Contreras had left the door to One-Stop open. Another officer entered One-Stop and found Diaz inside. Diaz was detained as part of a protective sweep of the interior of One-Stop. Neither he nor Ramirez-Contreras offered any resistance.

An officer Mirandized[2] Diaz in English. Diaz then, without requesting an attorney, verbally consented to a search of One-Stop and also signed a form consenting to such a search. Although Diaz stated he was fluent in both English and Spanish, the consent form was in Spanish, and a Spanish-speaking officer reviewed it with Diaz. Once the consent form was executed, the officers searched the premises with the drug sniffing dog. The dog indicated that drugs were present in the pallet of tile next to Diaz. The pallet was opened and almost 40 kilograms of cocaine were found. It is this evidence that Diaz sought to suppress.

Even when undertaken without a warrant, a search is constitutionally

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

reasonable if conducted pursuant to consent from a third party with authority to authorize it, or who reasonably appears to an officer to have such authority. United States v. Brazel, 102 F.3d 1120, 1148 (11th Cir. 1997) (citations omitted). And a third party has authority to consent to a search of an area "if he has mutual use of it, with joint access or control of the area for most purposes." Id.

Here, Shull obtained consent to search One-Stop's loading dock from two sources: the other tenants prior to the raid, and Diaz himself afterwards. Diaz argues that the other tenants lacked authority to consent to the search and that his consent to the search was not knowing and voluntary. We consider each argument in turn.

At the suppression hearing, Diaz contested that the other tenants had authority to consent to Shull's entry into, and search of, the loading dock. He argued that only One-Stop had authority over the loading dock, and thus, had a reasonable expectation of privacy in it. The district court concluded that the loading dock was common to all tenants of the property, and thus that the other tenants had both actual and apparent authority to consent to Shull's search. This factual determination is not clearly erroneous. First, the leases signed by all the tenants in the building did not specifically grant access to the loading dock, nor otherwise mention it. Second, the other tenants had physical access to the dock,

5

and one testified that his business used it. Third, and perhaps most importantly, both the landlord and the managers of Ambit and BAB were given keys to the loading dock. Shull himself got his key from these other tenants. That the other businesses had keys to give Shull is inconsistent with the notion that One-Stop had an expectation of privacy in the dock.

Thus, the other tenants had authority to grant Shull access to the loading dock for a search. That makes the warrantless entry into the loading dock constitutionally reasonable.[3] Once the officers entered the dock and Ramirez-Contreras announced he had a gun, there was ample cause for a protective sweep of the dock and interior of One-Stop.

But consent to search the loading dock itself, plus a protective sweep alone, would not entitle the officers to cut open the closed pallet inside One-Stop. The other tenants had authority only to consent to a search of the common loading dock, not to the interior of One-Stop where the pallet of drugs was found. The

_____

[3] Diaz argues that Georgia v. Randolph, 547 U.S. 103 (2006), compels the conclusion that this search was unreasonable because consent was not obtained from Ramirez-Contreras. This argument badly over-reads Randolph. In Randolph, the defendant was present when police searched his home; his wife consented to the search but he refused to do so. The Supreme Court held the search was unreasonable as to the defendant because of his objection. There are two significant distinctions between this case and Randolph. First, this search was of a business, where there is a significantly diminished expectation of privacy in comparison to a home. See United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citations omitted). Second, unlike in Randolph, there is no evidence that Ramirez-Contreras had any possessory right over the one-Stop premises or that he protested the search of the loading dock or of One-Stop.

protective sweep entitled the officers to enter One-Stop, but only to the extent necessary to ensure they were not in danger. See, e.g., United States v. Delancy, 502 F.3d 1297, 1306 (11th Cir. 2007). In other words, the co-tenant's consent and protective sweep justified entering the loading dock, detaining Ramirez-Contreras, entering One-Stop through the open door, and detaining Diaz, but would not have permitted the officers to bring a drug dog to sniff the pallet and then cut it open. Thus, we must also consider whether Diaz's consent to a search of One-Stop was voluntary. United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002). Voluntariness is determined from the totality of the circumstances; pertinent facts include

> whether the defendant was free to leave, whether there was coercive police procedure, the extent of the defendant's cooperation or awareness of a right to refuse to consent, whether the defendant could refuse to consent, the extent of the defendant's education and intelligence, and the defendant's belief that no incriminating evidence would be found.

Id. (citations omitted). Here, the district court was correct in concluding that Diaz voluntarily consented to the search. True, Diaz was arrested in a surprise police raid. But things cooled off once the area was secured, and it appears several minutes passed before Diaz signed the consent form. There is no clear error in the district court's factual finding that the police did not threaten or intimidate Diaz, or otherwise treat him coercively in procuring the waiver. Moreover, Diaz's English

7

is excellent, and in any event, the consent form was printed in Spanish and explained to him in Spanish – he obviously understood what he was being asked to consent to. Under the circumstances, we agree that consent to search was voluntarily given. Accordingly, the search did not violate the Fourth Amendment, and its fruits were admissible.

## II.

Next, Diaz argues that the district court erred by denying his motion to sever his trial from Ramirez-Contreras's. The two were indicted together and thus presumptively should be tried together. United States v. Cobb, 185 F.3d 1193, 1197 (11th Cir. 1999). We review the denial of a severance motion for abuse of discretion, and we will order a new trial only if Diaz can show (i) compelling prejudice from joinder, (ii) which can be remedied only by severance. See, e.g., United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007) (citations omitted). There are only two situations where severance is the only permissible remedy: when there is a serious risk that a joint trial would compromise a specific trial right of a defendant, or when joinder would prevent the jury from reliably judging a defendant's guilt or innocence. Id.

Diaz argues the joinder prejudiced his ability to make his defense and prevented a reliable judgment about guilt. Diaz's theory of the case was that

8

Ramirez-Contreras delivered the "tile" pallet to the warehouse at One-Stop, but that Diaz did not know that the pallet was full of cocaine. After his arrest, Ramirez-Contreras allegedly made a self-incriminating statement to Officer Walker, which also implicated Diaz by stating that an earlier drug shipment was opened in Diaz's presence. Diaz moved for severance prior to trial, anticipating that Ramirez-Contreras would not testify and arguing that admission of the unredacted statement through Walker would constitute Bruton[4] error.

In fact, Ramirez-Contreras ultimately testified. Parts of Ramirez-Contreras's alleged statement were introduced during the government's case in chief by Walker, but the examination of Walker at that time avoided reference to the statements inculpating Diaz, effectively redacting the statements to avoid Bruton error. On cross-examination of Ramirez-Contreras by the government, Ramirez-Contreras denied making any statement inculpating himself or Diaz in drug activity. Diaz then had an opportunity to cross-examine Ramirez-Contreras about his statement, obviating any potential Bruton error. See United States v. Arias-Izquierdo, 449 F.3d 1168, 1184-85 (11th Cir. 2006) (citations omitted). Then, during the government's rebuttal case, Walker was recalled to the stand and in the process, described Ramirez-Contreras's alleged statement more fully, explaining in

_____

[4] Bruton v. United States, 391 U.S. 123 (1968).

9

particular that Ramirez-Contreras told him that Diaz had been present when a prior shipment of drugs was opened. Thus, Ramirez-Contreras's statement to Walker implicating Diaz was properly admissible as impeachment by prior inconsistent statement.[5]

Diaz also argues that severance was due because he was prejudiced by the association with Ramirez-Contreras, who was an illegal alien, possessed a weapon during the drug transaction, and had a prior drug-related conviction. Yet the jury was duly instructed to consider each defendant separately, and it did, acquitting Diaz of possessing a firearm during and in relation to a drug crime, 18 U.S.C. § 924 (c)(1)(A)(i), while convicting Ramirez-Contreras of that offense.

Because no Bruton error occurred and the jury followed its instructions to consider each defendant separately, Diaz has not shown prejudice warranting severance and retrial.

## III.

Diaz also contends the district court abused its discretion by limiting the time of his closing argument. The government was given forty minutes for closing; each defendant was given twenty. We will reverse only if Diaz did not

---

[5] It appears no limiting instruction was given, but no request for such an instruction was made. The failure to give a limiting instruction is error only when such an instruction is requested. Fed. R. Evid. 105; United States v. Miranda, 197 F.3d 1357, 1360 (11th Cir. 1999).

have the "opportunity to make all legally tenable arguments that are supported by the facts of the case." United States v. Gaines, 690 F.2d 849, 858 (11th Cir. 1982) (citations omitted). And we previously have rejected challenges to closing argument time in multi-defendant trials where the government received argument time equal to all the defendants' time put together. See United States v. Carter, 760 F.2d 1568, 1581 (11th Cir. 1985).

After a review of the record, we find no abuse of discretion in limiting Diaz's closing argument. The evidence in the case was not voluminous, and counsel was able to make his essential points fairly.

**IV.**

Finally, Diaz challenges his 292-month sentence. The district court found Diaz liable for 129.55 kilograms of cocaine, resulting in a Guidelines base offense level of 36. U.S.S.G. § 2D1.1(c)(2). The district court then (i) applied a two-level enhancement for obstruction of justice, U.S.S.G. § 3C1.1, finding that Diaz committed perjury when he testified, (ii) applied a two-level enhancement for Diaz based on Ramirez-Contreras's possession of a weapon in furtherance of the conspiracy, U.S.S.G. § 2D1.1(b)(1), and (iii) declined to grant a two-level minor-role reduction, U.S.S.G. § 3B1.2. The district court thus computed Diaz's total offense level as 40, which, combined with a criminal history category of I, resulted

11

in an advisory Guidelines range of 292 to 365 months.  U.S.S.G. § 5A.  Diaz was ultimately sentenced to 292 months.

Diaz first challenges the application of the Guidelines, as to both the base offense level and the two enhancements.[6]  We review the district court's factual findings for clear error but review de novo questions of law arising under the Guidelines.  See, e.g., United States v. Crawford, 407 F.3d 1174, 1177-78 (11th Cir. 2005).

We begin with the base offense level, which depends on the amount of cocaine attributable to Diaz.  The district court adopted the PSI's conclusion that Diaz should be held accountable for 129.55 kilograms of cocaine, as follows.  The raid of One-Stop resulted in the confiscation of 39.55 kilograms of cocaine. Moreover, according to Walker, Ramirez-Contreras admitted to receiving at least one other shipment of thirty kilograms.  In addition to the shipment admitted to by Ramirez-Contreras, the government's documentary evidence reflected that One-Stop received two additional shipments of tile from the same Mexican factory as the shipment containing the cocaine stash seized in the raid.  Hence, the final calculation included three shipments estimated at thirty kilograms each, plus the 39.55 kilograms actually seized.

_____

[6] Diaz's brief is unclear about his sentencing challenges.  After reviewing it carefully, we cannot conclude he preserved any argument concerning a minor role reduction.

12

A base offense level of 36 is appropriate for any amount of cocaine between 50 and 150 kilograms. U.S.S.G. § 2D1.1(c)(2). Because the drugs seized in the raid totaled 39.55 kilograms, the judge needed to find only ten and a half more kilograms to properly begin the Guidelines calculation with a base offense level of 36. Given Walker's statement that Ramirez-Contreras's admitted a prior shipment of thirty kilograms, which it was not clear error to credit, it was entirely proper to attribute over fifty kilograms to both defendants. Nor was there clear error in estimating the prior shipments at thirty kilograms each based on Ramirez-Contreras's statement. The record amply supports the district judge's determination of the base offense level.

Next, we address Diaz's challenge to the two level enhancement for possession of a weapon. Diaz argues that the enhancement was unwarranted because he was acquitted by the jury of his § 924(c) charge. But as the Guidelines commentary makes clear, the enhancement is appropriate where a weapon is present unless it is clearly improbable that a weapon is connected with the offense. U.S.S.G. § 2D1.1, comment. n.3. And we have held that the enhancement may be appropriately applied based on a co-conspirator's possession of a weapon, even where the defendant was acquitted of a weapons charge. United States v. Stanley, 24 F.3d 1314, 1322-23 (11th Cir. 1994). For an enhancement based on a co-

13

conspirator's possession to be warranted, the possessor of the weapon must be charged and found to have possessed the weapon, and the defendant must be a member of the conspiracy at the time he did so. Id. All three of these requirements are satisfied here: Ramirez-Contreras was charged and convicted of possessing a weapon during the drug transaction, and the evidence was sufficient to infer that Diaz was involved in the conspiracy at the time of the raid of One-Stop. Nor is it improbable or unforeseeable that firearms will be present in unloading a large shipment of narcotics. United States v. Pessefall, 27 F.3d 511, 514 (11th Cir. 1994). The firearm enhancement was appropriate.

We also consider whether the district court erred in applying a two level enhancement for obstruction of justice. The proffered basis for doing so was that Diaz perjured himself when he testified at trial. Essentially, Diaz claimed that he was a legitimate real-estate agent and that, for all he knew, One-Stop was a legitimate business. Yet there was persuasive evidence that One-Stop had no real business or public visitors of any sort. Moreover, there was evidence (i) that One-Stop did no tile contracting, (ii) that the tile shipped there was unusable in Georgia, (iii) that Diaz knew this from attempting to sell some of the tile One-Stop received to a nearby retail outlet, and (iv) that despite its unusability, Diaz continued to arrange for more tile shipments from Mexico. This strongly suggests Diaz was

14

complicit in the drug importation, despite his protestations under oath to the contrary. The enhancement for perjury was warranted.

Finally, Diaz appears to argue that the district court misapplied the 18 U.S.C. § 3553(a) factors. In undertaking this substantive review of the sentence, we must consider whether, under the totality of the circumstances, the application of the § 3553(a) factors was an abuse of discretion. See United States v. Pugh, 515 F.3d 1179, 1190-92 (11th Cir. 2008) (citations omitted). We find no such abuse here; the district court permissibly balanced the § 3553(a) factors. In particular, the district court's reliance on the large quantity of drugs in this case and on Diaz's lack of contrition was not an abuse of discretion. Accordingly, we affirm Diaz's sentence.

## V.

Ramirez-Contreras raises a sole argument on appeal: whether the district court erred by denying his motion to suppress inculpatory statements he allegedly made to Agent Walker on the grounds that they were involuntarily made. Ramirez-Contreras argues that he requested an attorney in the middle of his interrogation, before he made the incriminating statements. Accordingly, he contends he adequately invoked his right to remain silent, further interrogation should have ceased, and statements made after his invocation should be

15

suppressed, including the alleged incriminatory statements (which he denies

making in any event). See, e.g, Coleman v. Singletary, 30 F.3d 1420, 1424 (11th

Cir. 1994). The government disputes this account of the facts, arguing that

Ramirez-Contreras did not ask for an attorney until after the incriminating

statements were made. A Jackson-Denno[7] suppression hearing was held in the

middle of trial, outside the presence of the jury, to resolve this question. Again, we

review the district court's factual findings for clear error and construe the facts in

the light most favorable to the government, but the resolution of legal and mixed

questions, including the ultimate conclusion about the voluntariness of an alleged

confession, is reviewed de novo. United States v. Barbour, 70 F.3d 580, 584 (11th

Cir. 1995).

It is undisputed that Ramirez-Contreras requested an attorney at some point

in his interrogation; the dispute is over when he did so. At the hearing, Agent

Walker testified that after Ramirez-Contreras was detained and arrested in the raid

on One-Stop, he read Ramirez-Contreras his Miranda rights at some time between

9:00 and 9:30 AM, and that he did so in the presence of other officers. He then

questioned Ramirez-Contreras at One-Stop for two hours or so, during which time

Ramirez-Contreras did not request an attorney and admitted to extensive

---

[7] Jackson v. Denno, 378 U.S. 368 (1964).

16

involvement in drug trafficking. Walker then asked Ramirez-Contreras to contact clients to whom he supplied cocaine, which Ramirez-Contreras refused to do. It was at that point, Walker testified, that Ramirez-Contreras asked to speak with an attorney. Ramirez-Contreras made some calls in an attempt to secure an attorney, but was unable to do so. The interrogation continued. Ramirez-Contreras subsequently agreed to make recorded phone calls to his drug clients. Walker took Ramirez-Contreras to a hotel where drugs were to be exchanged. Ramirez-Contreras made several phone calls from the hotel, which were recorded by law enforcement agents, but no buyers appeared. The sting ended when Ramirez-Contreras received a threat against his family in one phone conversation with a potential buyer. Walker also testified that Ramirez-Contreras was not threatened, coerced, or promised anything by the officers throughout the interrogation.

Ramirez-Contreras points to inconsistencies in certain aspects of Walker's testimony. The interrogation was not recorded and Walker admitted that his memory of that day's events was not very good, particularly with respect to the times that the various events occurred. Moreover, Walker's testimony about certain details of the attempted sting was contradicted by other agents.

Two other officers, Grindle and Shull, testified at the suppression hearing. They also stated that Ramirez-Contreras was Mirandized early in the interrogation,

17

and that he did not request an attorney until after admitting involvement with drugs. Unlike Walker, neither was present for the entire interrogation. They also admitted that they told Ramirez-Contreras he should cooperate, but stated they did not promise him anything for his cooperation.

Ramirez-Contreras also testified at the suppression hearing. He stated he was not given Miranda warnings at the outset of the interrogation. He said that upon being questioned by Walker, he denied any involvement with drugs and stated that he was being paid $10 per hour to unload the truck. Ramirez-Contreras also said that Walker was yelling at him, and intentionally misrepresenting his statements in the notes of the interview. Accordingly, he asked for an attorney early in the interrogation, but was not allowed to attempt to contact one for some time. Eventually, the officers brought him a phone book and allowed him to make some calls to attorneys, but he could not reach one.[8] The interrogation then continued, including the attempt to set up a drug purchase.

According to Ramirez-Contreras, Walker also told him he should cooperate or he would spend the rest of his life in prison, a threat he reiterated after Ramirez-

---

[8] Ramirez-Contreras proffered records showing he made two calls from his cellular phone; the first was made at 11:14 AM. Assuming, as Ramirez-Contreras would have us, that these represent the unsuccessful calls to attorneys, it is apparent that the interrogation had been going on for about two hours at the time the calls were made. The government argues this necessarily implies the invocation of the right to counsel occurred after the inculpatory statement. But the records cannot show whether Ramirez-Contreras was truthful when he said he invoked his rights earlier but was not allowed to make the call until some time later.

Contreras initially refused to make calls to his drug clients and requested an attorney. Indeed, Ramirez-Contreras said he requested an attorney more than ten times. After two to three hours of questioning and phone calls, Ramirez-Contreras was taken from One-Stop to a police station. Walker was still questioning him. Ramirez-Contreras was receiving calls on his cell phone at this time, but was not allowed to disclose that he was in police custody. After a stop at the police station, Ramirez-Contreras was taken to the hotel for the failed sting attempt.

In short, there was conflicting evidence at the hearing as to whether Ramirez-Contreras was Mirandized before or after giving his inculpatory statement, and whether he requested a lawyer before or after giving the statement. Resolving these conflicts required the trial judge to make credibility assessments, and we afford those assessments substantial deference. See, e.g, United States v. Pham, 463 F.3d 1239, 1244 (11th Cir. 2006) (citation omitted). The district court did not clearly err in resolving the evidentiary conflicts to find that Ramirez-Contreras (i) was properly Mirandized at the beginning of the interrogation, (ii) did not request a lawyer until after making his incriminating statement, and (iii) was not threatened by the officers interrogating him. Several government witnesses testified to this version of events. Although there are some minor inconsistencies in the officers' statements, the record does not leave us with a definite and firm

19

conviction that error has occurred, and we will not disturb the district judge's credibility determinations and his factual findings about how the interrogation proceeded. Accordingly, we agree with his decision that Ramirez-Contreras's inculpatory statements were voluntarily given, and therefore properly admissible.

**AFFIRMED.**