[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12549

_____

D.C. Docket No. 3:10-cr-00073-TJC-JBT-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHARLES MARVIN WATKINS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 28, 2014)

Before TJOFLAT, WILSON, and RIPPLE,* Circuit Judges.

---

* Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

RIPPLE, Circuit Judge:

Charles Marvin Watkins agreed to assist law enforcement in a murder investigation after the body of a seven-year-old girl, with whom he was acquainted, was found in a landfill. When questioned by an investigating officer, he admitted to having downloaded and viewed child pornography. A detective then asked Mr. Watkins for permission to search his computers for information relevant to the murder investigation. After being assured that the officer was not searching for his child pornography but only for clues to the girl's murder from sites she had visited on the computers while visiting his home, Mr. Watkins agreed to a search. His wife later independently consented to a general search of the computers.

Evidence of child pornography from the search was used subsequently to charge Mr. Watkins under 18 U.S.C. § 2252 for receipt of child pornography by computer over the internet. Mr. Watkins moved to suppress the evidence from the computers. A magistrate judge held a hearing and recommended denial of the motion. After reviewing the record, the district court denied the motion. It reasoned that the detective's assurances about the scope of the search had limited Mr. Watkins's consent to evidence relevant to the murder investigation, but that

2

Mrs. Watkins's consent authorized a general search and therefore permitted discovery of the child pornography evidence. The district court held that the search was not invalid under Georgia v. Randolph, 547 U.S. 103, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006), because Mr. Watkins had not expressed an objection when his wife consented to an unlimited search. Mr. Watkins moved for reconsideration of the suppression order and to reopen the suppression hearing; his motion was denied. After a bench trial on the charged offense, Mr. Watkins was found guilty based on stipulated facts and was sentenced to 60 months' imprisonment. He timely appealed.

We now determine that the search was valid because, despite the infirmities that the district court detected in Mr. Watkins's consent to search the computers, Mrs. Watkins consented to a full search of the computers, and Mr. Watkins failed to show that the search violated his rights under Randolph. Accordingly, we affirm the judgment of the district court.

# I

# BACKGROUND

## A.

### 1.

Somer Thompson, a seven-year-old girl, was murdered after she disappeared while walking home from school on October 19, 2009.[1]  She frequently had played with Mr. Watkins's grandchildren and other children at his home.  Following her disappearance, Mr. Watkins was questioned by several local law enforcement officers as well as agents from the Federal Bureau of Investigation ("FBI").

On October 24, 2009, three days after Thompson's body was found in a Georgia landfill, FBI Special Agent Jonathan MacDonald and Florida Department of Law Enforcement Special Agent Keesha Woessner visited Mr. Watkins's home to talk to him about the murder.  Agent MacDonald asked Mr. Watkins for permission to search his computer; he agreed.  The agent looked at the internet search history and desktop items on the computer and unsuccessfully tried to run an FBI program to isolate images and videos.  The agent also noted that

---

[1]  A person with no connection to this case was later charged with the murder.

4

LimeWire, a peer-to-peer file-sharing program, was running on the computer. The agent wrote down the computer's internet protocol address for later use because he knew that LimeWire was sometimes used to trade child pornography.

Later that day, an investigator from the Clay County Sheriff's Office asked Mr. Watkins to visit the office, and Mr. Watkins agreed. At the office, Mr. Watkins was interviewed by Detective Charlie Sharman. The interview was recorded on video. The detective told Mr. Watkins that he was being questioned about the disappearance of Somer Thompson. Mr. Watkins expressed a willingness to help in any way he could.

As the interview progressed, Mr. Watkins stated that his grandchildren and their friends, including Somer Thompson, had visited his house regularly. The children would use the internet to play online computer games, including Webkinz and Club Penguin. When questioned about who might have preyed on Somer Thompson, Mr. Watkins, "speculating about who might [have] be[en] responsible for Somer's abduction and murder, admitted he had previously downloaded and[] viewed child pornography on his computer."[2] He "stated that he had knowledge of predators because he had viewed child pornography in the

---

[2] R.22 at 4, para. 20.

5

past."[3]  Upon further questioning, Mr. Watkins admitted that he had used LimeWire to download and view child pornography approximately one hundred times.

The detective then questioned Mr. Watkins about his child pornography activities and acknowledged that the questions might be "embarrassing . . . but . . . we're trying to get to the bottom of it."[4]  While Detective Sharman was briefly out of the room, but while the video recording continued, Mr. Watkins received a phone call from his wife.  During the course of the call, he told his wife that he was being questioned about the children's computer use.  He also related that he had told investigators about looking at some "pretty nasty stuff"[5] accessible through LimeWire.[6]

When Detective Sharman returned to the interview room, Mr. Watkins told the detective that the questioning was difficult for him because "some things . . .

---

[3]  R.48 at 5.

[4]  R.22 at 4, para. 22 (alterations in original) (internal quotation marks omitted).

[5]  R.48 at 5 (internal quotation marks omitted).

[6]  Neither Mr. Watkins nor Mrs. Watkins made an objection to the admission or use of this communication on the ground of marital privilege.  Therefore, we have no occasion to express an opinion as to its admissibility.

6

might put [him] in a bad light," but that he had "to be honest" with the detective.[7]

Mr. Watkins stated that he was "more concerned" about Somer Thompson.[8] The

detective replied, "[t]hat is why we are here.  We are not interested in . . . what's

on the computer unless there is something on the computer . . . ."[9] The detective

did not finish his sentence because Mr. Watkins interrupted, saying, "[i]f it's

relevant, you know."[10]

Detective Sharman then asked Mr. Watkins for access to the three

computers in his home because they "may hold something about this, and they

may not, you know."[11] Mr. Watkins agreed to help the detective with "whatever

[he] need[ed]" from the computers.[12] The detective then stated:

> What I want to do is just get – just get a consent to look
> and see what – now you told me a couple of programs
> [Mr. Watkins's computers] got, and just see if anyone
> has been trying to pe[ek] in there or talk in there, if these
> people on the other end are who they say they are.  I am

---

[7]  R.22 at 5, para. 26 (internal quotation marks omitted).

[8]  Id. (internal quotation marks omitted).

[9]  Id. at 5, para. 27 (alterations in original) (internal quotation marks omitted).

[10]  Id. (alteration in original) (internal quotation marks omitted).

[11]  Id. at 5, para. 29 (internal quotation marks omitted).

[12]  Id. at 5, para. 30 (internal quotation marks omitted).

> not worried about your files and all that kind of stuff.
> That's what you – I've got my own private stuff on my
> computer, you know what I am saying?[13]

Mr. Watkins replied affirmatively.  The detective later asked to introduce Mr. Watkins to his "computer guy," Detective Fred Eckert, so that investigators could examine the programs on his computer.[14]

Mr. Watkins subsequently read and signed a voluntary consent form authorizing a full search of his computers.  Parts of the form were read aloud to Mr. Watkins by Detective Eckert, although the paragraph stating that he had been advised of his right to refuse consent and that he gave consent freely and voluntarily was not read aloud.

## 2.

Around the time that Mr. Watkins finished his interview at the sheriff's office, Detective Eckert, Sergeant Wayne McKinney and an evidence technician went to Mr. Watkins's home.  Detective Eckert met Mrs. Watkins, explained that Mr. Watkins had signed a form consenting to a search of the computers in the

---

[13] Id. at 5-6, para. 31.

[14] Id. at 6, para. 33 (internal quotation marks omitted).

home[15] and asked for her consent to search the computers as well.  She agreed, although she later claimed that she did so with the understanding that the search was limited to the murder investigation and the websites the children had visited.

After Mrs. Watkins had consented verbally to a search of the computers, Mr. Watkins arrived.  The couple spoke for a few minutes while Detective Eckert stood nearby.  The detective later testified that he could not hear what they said; Mrs. Watkins testified that the detective could have heard and that Mr. Watkins had informed his wife that the officers were searching the computers only for information related to the children and the murder investigation.

Mrs. Watkins, the detective and Mr. Watkins then sat at a table together. The detective read aloud to Mrs. Watkins a form consenting to a complete search of the computers; Mrs. Watkins also read and signed the form.  This consent form was identical to the one Mr. Watkins had signed at the sheriff's office. Mr. Watkins did not register any objection or reservation while officers sought and obtained Mrs. Watkins's consent to an unlimited search of the computers.

---

[15]  Neither Detective Eckert nor Mrs. Watkins testified about the exact phrasing of this statement.  See R.45 at 68, 132-33, 152-53.

Mr. Watkins then led investigators to the computers in the home, and the technician removed them.

Department of Homeland Security, U.S. Immigration and Customs Enforcement Special Agent James Greenmun performed a forensic analysis of an imaged copy of the hard drive on Mr. Watkins's personal computer.[16]  He discovered child pornography files that had been deleted.  The Government then initiated a child pornography case against Mr. Watkins.  Mr. Watkins subsequently withdrew his consent to the search of his computers, but Agent MacDonald obtained a search warrant for Mr. Watkins's computer.

**B.**

A grand jury charged Mr. Watkins with receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2) and (b)(1).  Mr. Watkins moved to suppress the child pornography because, he urged, it was obtained through an unlawful search of his computer.  After an evidentiary hearing, a magistrate judge issued a Report and Recommendation.  He concluded that the search had exceeded the

---

[16]  Of the three computers in Mr. Watkins's home, one was used primarily by Mr. Watkins, one was used primarily by Mrs. Watkins, and one was used primarily by the children.

10

scope of Mr. Watkins's consent but that it was within the scope of Mrs. Watkins's consent. In reaching this conclusion, the magistrate judge first examined the false assurances that Detective Sharman had given to Mr. Watkins about the purpose of the search and determined that Mr. Watkins's consent to the search therefore was limited to evidence relevant to the murder investigation. With respect to Mrs. Watkins's consent, the magistrate judge credited Detective Eckert's testimony over Mrs. Watkins's testimony about the scope of her consent. The magistrate judge found Mrs. Watkins less credible than the detective because her assertions were "unclear and inconsistent."[17] He also noted Mrs. Watkins's interest in the outcome of the case due to her love for her husband.

The magistrate judge also identified several inconsistencies in Mrs. Watkins's testimony: Mrs. Watkins had testified inconsistently about her recollection of her phone call with her husband while he was being questioned at the sheriff's office. She testified on cross-examination that they had discussed that the police were coming to the house to check the websites that the children had visited. The recorded interview contradicted that testimony. She then testified that she did not recall the substance of the conversation. Mrs. Watkins also

---

[17] R.48 at 18.

11

testified inconsistently about when she had learned that her husband had downloaded and viewed child pornography.  She first testified repeatedly that it was the night before her husband was questioned at the sheriff's office and the officers removed the computers.  Later, at the suppression hearing, she stated that she did not learn about his child pornography until after the computers were taken.  The magistrate judge found her inconsistent recollections about that conversation particularly suspicious.

Mr. Watkins objected to the magistrate's Report and Recommendation.  The district court held oral argument to consider the magistrate judge's credibility determination about the scope of Mrs. Watkins's consent, but ultimately adopted the finding in the Report and Recommendation that she had consented to an unlimited search of the computers.  The district court noted that neither Mrs. Watkins nor the officers had stated the object of the search or otherwise expressed any limitations to it.  The district court also rejected Mr. Watkins's argument that the search was invalid under Randolph because he had not consented to the search even if Mrs. Watkins had.  The district court concluded that Mr. Watkins had "not actually express[ed] a refusal to consent to an unlimited search of the computers" as Randolph required; instead, "he consented to the

detective's request for a search that was implicitly limited . . . to certain content of the computers."[18]

After the district court adopted the magistrate judge's Report and Recommendation, Mr. Watkins moved for reconsideration and sought a new evidentiary hearing before the district court. His motion was denied. The district court subsequently conducted a bench trial on stipulated facts and found Mr. Watkins guilty of the charged offense. It sentenced Mr. Watkins to 60 months' imprisonment. He timely appealed.

## II

## DISCUSSION

### A.

Mr. Watkins now asks us to review the district court's denial of his motion to suppress the evidence obtained by the Government as a result of the searches of his computers and its denial of his motion for reconsideration and to reopen the evidentiary hearing.[19] As he did in the district court, Mr. Watkins contends that

---

[18] R.52 at 3 (internal quotation marks omitted).

[19] The district court had jurisdiction under 18 U.S.C. § 3231. This court has jurisdiction over this appeal under 28 U.S.C. § 1291.

13

the search was invalid because it was conducted without a warrant and without his consent.  Noting that the district court found that he had consented only to a search of the children's programs on his computers, he submits that his wife's consent was not sufficient, as a matter of law, to overcome the limited scope of his own permission.  He relies principally on the decision of the Supreme Court of the United States in Randolph as support for his view.  Therefore, our resolution of this appeal requires that we explore the contours of that decision and ascertain the correct application of its holding to the facts set forth in the record before us.

We begin our task by placing Randolph in the existing doctrinal mosaic of Fourth Amendment jurisprudence.  The Fourth Amendment protects "[t]he right of the people to be secure in their . . . houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.  "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."  Riley v. California, 134 S. Ct. 2473, 2482 (2014); see also Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 619, 109 S. Ct. 1402, 1414, 103 L. Ed. 2d 639 (1989); Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980); Mincey v. Arizona, 437 U.S. 385, 390, 98 S. Ct. 2408, 2412, 57 L. Ed. 2d 290 (1978); Coolidge v. New Hampshire, 403 U.S. 443,

14

454-55, 91 S. Ct. 2022, 2032, 29 L. Ed. 2d 564 (1971); Lebron v. Sec'y, Fla. Dep't of Children & Families, 710 F.3d 1202, 1206 (11th Cir. 2013).  The exceptions to the warrant requirement are firmly established but "jealously and carefully drawn." Jones v. United States, 357 U.S. 493, 499, 78 S. Ct. 1253, 1257, 2 L. Ed. 2d 1514 (1958).  One of those exceptions is that a warrantless search is permissible if it is preceded by a valid consent.  Fernandez v. California, 134 S. Ct. 1126, 1132, 188 L. Ed. 2d 25 (2014); Schneckloth v. Bustamonte, 412 U.S. 218, 230-31, 93 S. Ct. 2041, 2049, 36 L. Ed. 2d 854 (1973).  Valid consent may be granted by a person with actual or apparent authority to give permission to search.  See Illinois v. Rodriguez, 497 U.S. 177, 186-89, 110 S. Ct. 2793, 2800-01, 111 L. Ed. 2d 148 (1990).

Whether a person consented to a search is, as a general proposition, a matter of fact, and therefore is reviewed for clear error.  Schneckloth, 412 U.S. at 227, 93 S. Ct. at 2047-48; United States v. Zapata, 180 F.3d 1237, 1240-41 (11th Cir. 1999); see also United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) (listing factors to consider when assessing voluntariness of consent to a warrantless search, including the coerciveness of police procedures as well as the defendant's custodial status, education, intelligence, cooperation with police, awareness of his

15

right to refuse consent and belief that no incriminating evidence will be found).

"In conducting a search pursuant to a properly obtained, voluntary consent, . . . the

extent of the search must be confined to the terms of its authorization." Blake,

888 F.2d at 798.

In reviewing the district court's denial of a motion to suppress, we must take

the facts in the light most favorable to the Government. United States v. Goddard,

312 F.3d 1360, 1362 (11th Cir. 2002). Finally, the scope of a search based on

consent may not exceed the scope of the given consent. Florida v. Jimeno, 500

U.S. 248, 251, 111 S. Ct. 1801, 1803-04, 114 L. Ed. 2d 297 (1991). "The standard

for measuring the scope of . . . consent . . . is that of 'objective' reasonableness–

what would the typical reasonable person have understood by the exchange

between the officer and the [individual giving the consent]?" Id.; Zapata, 180

F.3d at 1242.

Obtaining valid consent when the property to be searched is controlled by

more than one person is hardly a new situation for the Supreme Court or for the

lower federal courts. In United States v. Matlock, the Supreme Court, after

reviewing the long-established practice of the circuits, confirmed that "the consent

of one who possesses common authority over premises or effects is valid as

16

against the absent, nonconsenting person with whom that authority is shared."

415 U.S. 164, 170, 94 S. Ct. 988, 993, 39 L. Ed. 2d 242 (1974).  Notably, in

addressing how courts ought to determine whether an individual has common

authority over the object of the search, the Court expressed its impatience with

"metaphysical subtleties" in earlier cases and specifically eschewed any reliance

on the "historical and legal refinements" in the law of property.  Id. at 171 & n.7,

94 S. Ct. at 993 & n.7 (quoting Frazier v. Cupp, 394 U.S. 731, 740, 89 S. Ct. 1420,

1425, 22 L. Ed. 2d 684 (1969) (internal quotation marks omitted)).  Rather, held

the Court:

> The [common] authority which justifies the third-party consent rests
> . . . on mutual use of the property by persons generally having joint
> access or control for most purposes, so that it is reasonable to
> recognize that any of the co-inhabitants has the right to permit the
> inspection in his own right and that the others have assumed the risk
> that one of their number might permit the common area to be
> searched.

Id. at 171 n.7, 94 S. Ct. at 993 n.7.  With this legal landscape before us, we turn to

an examination of Randolph.

Randolph presented the Supreme Court with a variance of the situation

earlier presented in Matlock–whether the contemporaneous objection of a person

who shared common authority over a home prevented a search when one person

17

with authority had consented.  The Court concluded that "a physically present inhabitant's express refusal of consent to a police search [of his home] is dispositive as to him, regardless of the consent of a fellow occupant."  Randolph, 547 U.S. at 122-23, 126 S. Ct. at 1528.

In reaching its conclusion, the Court made clear that it did not intend to effect either a drastic dilution of or a dramatic shift away from its holding in Matlock.  It simply reasoned that, because "[t]he constant element in assessing Fourth Amendment reasonableness in the consent cases . . . is the great significance given to widely shared social expectations,"

> it is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, "stay out."  Without some very good reason, no sensible person would go inside under those conditions.

Id. at 111, 113, 126 S. Ct. at 1521-23.  The Court noted that its holding recognized the "centuries-old principle of respect for the privacy of the home" and the "special protection" that the home deserves as "the center of the private lives of our people."  Id. at 115, 126 S. Ct. at 1523 (internal quotation marks omitted). The Court not only specifically noted the narrowness of its holding to "the circumstances here at issue," but it also carefully circumscribed its holding:

18

> We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident.

Id. at 106, 120, 126 S. Ct. at 1519, 1526.  Indeed, after stating its specific holding, it pointedly addressed the continued vitality of the broad rule that it had established in Matlock.  Id. at 120-22, 126 S. Ct. at 1527-28.  The Court clearly emphasized the contemporaneous presence and action required of an objector to prevent a search: "[I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out."  Id. at 121, 126 S. Ct. at 1527 (emphasis added).[20]  The Court admitted to drawing a "fine line" in reaching its "formalis[tic]" holding.  Id.  In doing so, it noted that "it would needlessly limit

---

[20]  The Court did recognize an exception could be made to its presence requirement when evidence suggests that the police removed the potentially objecting tenant for the purpose of avoiding a possible objection.  Georgia v. Randolph, 547 U.S. 103, 121-22, 126 S. Ct. 1515, 1527-28, 164 L. Ed. 2d 208 (2006).  But see Fernandez v. California, 134 S. Ct. 1126, 1134, 188 L. Ed. 2d 25 (2014) (noting that a possible improper motive in removing a suspect does not invalidate the search if the removal was objectively justified).  Such an exception to Randolph's presence requirement is clearly not applicable here.  Mr. Watkins was not held at the sheriff's office, though he did arrive at his home after investigators.  Notably, he admits to being present when Mrs. Watkins signed the written consent form and even sat alongside her in their home when she signed it.  There is no evidence that police removed Mr. Watkins in order to avoid a possible objection from him.

19

the capacity of the police to respond to ostensibly legitimate opportunities . . . if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." Id. at 122, 126 S. Ct. at 1527.

In our previous cases, we have interpreted Randolph narrowly. See, e.g., United States v. Harris, 526 F.3d 1334, 1339 (11th Cir. 2008) (noting that taxi passenger who did not "actually express a refusal" to search when driver consented was not covered by Randolph); United States v. Delancy, 502 F.3d 1297, 1307-08 & n.7 (11th Cir. 2007) (determining that defendant who did not object was not covered by Randolph even though the defendant possibly considered objection futile).[21] Our sister circuits have read Randolph in similar fashion. See, e.g., United States v. Shrader, 675 F.3d 300, 306-07 (4th Cir. 2012) (noting that Randolph set forth a "clearly drawn rule" that a defendant must be

---

[21] Our unpublished decisions also stringently apply the requirements of Randolph. See United States v. Weeks, 442 F. App'x 447, 454 (11th Cir. 2011), cert. denied, 132 S. Ct. 1858, 182 L. Ed. 2d 648 (2012) (holding that district court did not clearly err in determining that a woman's oral consent was valid; potentially objecting party was within earshot of the home but did not voice any objection to the search); United States v. Sanders, 315 F. App'x 819, 824 (11th Cir. 2009) (holding Randolph did not apply where a defendant refused to sign a consent form but gave verbal consent to the search and did not object to a cotenant's consent); United States v. Diaz, 279 F. App'x 739, 742 n.3 (11th Cir. 2008) (distinguishing a search of a business from a search of a home because of the "significantly diminished expectation of privacy in comparison to a home").

20

both present and objecting), cert. denied, 133 S. Ct. 757, 184 L. Ed. 2d 500 (2012), reh'g denied, 133 S. Ct. 1320, 185 L. Ed. 2d 236 (2013); United States v. Cooke, 674 F.3d 491, 499 (5th Cir. 2012) (holding that the "objection of an absent cotenant does not vitiate the consent of a physically present cotenant" and noting that the Supreme Court seemed to have structured Randolph as "an exception to the general rule" of Matlock), cert. denied, 133 S. Ct. 756, 184 L. Ed. 2d 498 (2012); United States v. King, 604 F.3d 125, 137 (3d Cir. 2010) (holding that Randolph "does not extend beyond the home" to personal property), cert. denied, 131 S. Ct. 1467, 179 L. Ed. 2d 311 (2011); United States v. Henderson, 536 F.3d 776, 783 (7th Cir. 2008) (holding that "the contemporaneous presence of the objecting and consenting cotenants [w]as indispensable to the decision in Randolph"); United States v. Hudspeth, 518 F.3d 954, 960 (8th Cir. 2008) (en banc) (holding that child pornography defendant who earlier had refused consent to search computers did not meet Randolph exception because he "was not at the door and objecting" when his wife consented).[22]

---

[22] The Ninth Circuit once interpreted the Randolph exception more broadly. See United States v. Murphy, 516 F.3d 1117, 1125 (9th Cir. 2008) (holding that "[o]nce a co-tenant has registered his objection, his refusal to grant consent remains effective barring some objective manifestation that he has changed his position"). That interpretation was abrogated by the Supreme Court's opinion in Fernandez. 134 S. Ct. at 1135-36; infra note 25.

21

Just as Matlock confirmed the previous consensus of the courts of appeals with respect to the general rule,  the Supreme Court's recent pronouncement in Fernandez  confirmed the present understanding of the circuits that Randolph set forth a specific, narrow exception.  Fernandez, 134 S. Ct. at 1134-37 (holding that an objector must be present and contemporaneously objecting).  With this understanding of the scope of Randolph, we turn to an examination of the case before us.[23]

**B.**

**1.**

We review a district court's denial of a motion to suppress evidence for clear error as to factual findings and de novo as to its application of the law.

---

[23]  In Randolph, which involved a search of a home, the Court based its reasoning on "'widely shared social expectations'" and "'customary social usage'" about privacy in homes. Fernandez, 134 S. Ct. at 1135 (quoting Randolph, 547 U.S. at 121, 126 S. Ct. at 1527).  The Supreme Court has not established whether the rule in Randolph applies to privacy interests in computers or other personal effects.  Cf. Randolph, 547 U.S. at 131, 126 S. Ct. at 1531-33 (Roberts, C.J., dissenting) ("If two roommates share a computer and one keeps pirated software on a shared drive, he . . . has given up his privacy with respect to his roommate by saving the software on their shared computer."); United States v. Lumpkins, 687 F.3d 1011, 1014 (8th Cir. 2012) ("It is not clear that Randolph, which involved a search of a residence, applies in the context of a vehicle search."), cert. denied, 133 S. Ct. 1612, 185 L. Ed. 2d 599 (2013).  But see United States v. King, 604 F.3d 125, 137 (3d Cir. 2010) (holding that Randolph does not apply to searches of personal effects), cert. denied, 131 S. Ct. 1467, 179 L. Ed. 2d 311 (2011).  For the reasons discussed in the following analysis, we need not decide whether Randolph applies to computers or other personal effects.

United States v. Yeary, 740 F.3d 569, 579 n.25 (11th Cir. 2014).  We may affirm the denial of a motion to suppress on any ground supported by the record, and we consider the evidence in the light most favorable to the district court's judgment. Id.

Here, Mr. Watkins consented in writing to an unlimited search of the computers, but that consent followed repeated assurances by Detective Sharman that officers were interested in the computers only for the ongoing murder investigation.  The district court found that Detective Sharman's false statements misled Mr. Watkins about the purpose and the scope of the proposed search.  The district court therefore concluded that the scope of Mr. Watkins's consent was limited to information relevant to the murder investigation.  The parties do not contest this finding by the district court, and therefore, for purposes of this appeal, we shall accept that finding. Yeary, 740 F.3d at 579 n.25.

The parties do not dispute that Mrs. Watkins had the authority to consent to a search of the computers.  Nor do they dispute that Mrs. Watkins signed a consent form–after having the consent form read to her and after discussing it with Detective Eckert while she sat with her husband at a table in their home.  The parties also do not dispute that the consent form's terms clearly set forth the

23

unlimited scope of the search.  More precisely, the record reflects that the officers followed a formal process in seeking Mrs. Watkins's independent consent to a full search of the computers.  Detective Eckert first sought and obtained verbal consent from Mrs. Watkins to search the computers.  After Mr. Watkins arrived, Detective Eckert read the consent form aloud to Mrs. Watkins while all three were together at a table.  Mrs. Watkins also read the form herself before signing it.  Even accepting Mrs. Watkins's various assertions at face value–which the district court declined to do because of its assessment of her credibility–she consented to the search.  Moreover, the district court's finding that Mrs. Watkins gave unlimited consent to a search of the computers was not clear error.

Mrs. Watkins's consent to a plenary search is not vitiated by the Randolph exception to the general rule of Matlock.  Randolph's stringent requirements simply are not met here.  Mr. Watkins was present when Detective Eckert read the form to his wife; she read the form, and she signed the form.  The formality of the process made crystal clear that her consent was independent of his and was for a full search of the computers.  Declining to credit the testimony of Mrs. Watkins, the district court did not find that Mr. Watkins passed on to his wife any of the assurances that had been made to him and that, in the view of the district court,

24

caused his consent to be limited.  Moreover, Mr. Watkins sat through the entire

formal process conducted by Detective Eckert to obtain Mrs. Watkins's full,

independent consent.  The record is devoid of any indication that, during the

process, Mr. Watkins interposed any objection or suggested to his wife at any time

that the consent documents were in any way limited by another understanding.[24]

His silence and acquiescence hardly qualify as the type of objection required by

Randolph.  He was not, by any stretch of the phrase, "at the door and object[ing]"

within the meaning of Randolph.  547 U.S. at 121, 126 S. Ct. at 1527.

As we have noted earlier, the Supreme Court and the courts of appeals,

including this court, have defined Randolph as a narrow exception with specific

requirements.  To obtain the protections of Randolph, a defendant, while present

with his cotenant, must object to the search.  Mr. Watkins's actions fall well

---

[24] Mrs. Watkins did sign a consent form with wording identical to the form signed by Mr. Watkins.  The identical forms could not have impliedly limited her consent to the scope of his, however.  She had not seen his form when she signed hers and nothing in the record indicates that Mr. Watkins told her that the forms were the same.

25

outside Randolph's conception of an objection.[25]  The district court therefore did not err in concluding that the search was valid under Randolph.

### 2.

Mr. Watkins also requests that we review the district court's denial of Mr. Watkins's motion for reconsideration and to reopen the suppression hearing. Such a review is governed by the abuse of discretion standard.[26]

---

[25] Mr. Watkins's consent to a limited search at the sheriff's office does not qualify under Randolph as a present objection to his wife's later consent to a wider search.  Even if his consent to a limited search were construed as an objection to a wider search, the Supreme Court clearly held in Fernandez that a previous objection to a search does not meet Randolph's requirements. The Court flatly rejected an argument that a previous objection "remained effective until [the objector] changed his mind and withdrew his objection."  Fernandez, 134 S. Ct. at 1135.  It reasoned that the objector's position was inconsistent with Randolph for two reasons.  First, recognizing a standing objection "cannot be squared with the 'widely shared social expectations' or 'customary social usage' upon which the Randolph holding was based" because when "the objector is not on the scene . . . the friend or visitor is much more likely to accept the invitation to enter."  Id.  Second, recognizing a continuing or standing objection "would create the very sort of practical complications that Randolph sought to avoid."  Id.  The Court explicitly stated that a rule that "an objection, once made, should last until it is withdrawn by the objector . . . would be unreasonable."  Id.  It further rejected any argument that an objection "lasts for a 'reasonable' time."  Id. at 1136.  Mr. Watkins's limited consent to search is therefore not an objection within the ambit of Randolph.

[26] See United States v. Simms, 385 F.3d 1347, 1356 (11th Cir. 2004) (motion to reopen suppression hearing); see also Farris v. United States, 333 F.3d 1211, 1216 (11th Cir. 2003) (Rule 60(b)); Sanderlin v. Seminole Tribe of Florida, 243 F.3d 1282, 1285 (11th Cir. 2001) (Rule 59(e)).

26

After the suppression motion was denied, Mr. Watkins sought reconsideration and reopening of the suppression hearing so that the district court could make its own credibility determination about the conflicting testimony of Mrs. Watkins and Detective Eckert.  However, the district court was entitled, after thorough review and a de novo determination, to credit the magistrate judge's findings.  A district court is required to make "a de novo determination, not [to hold] a de novo hearing."  United States v. Raddatz, 447 U.S. 667, 674, 100 S. Ct. 2406, 2411, 65 L. Ed. 2d 424 (1980).

The magistrate judge provided thorough and reasonable support for his conclusions.  The district court noted that it had conducted an independent review of the entire record, including the complete transcript of the evidentiary hearing, before it adopted the magistrate judge's credibility determination.  The fact that the district court characterized its determination as not an "easy call"[27] does not mean that the district court erred in declining to reopen the hearing or to reconsider the denial of Mr. Watkins's motion to suppress.  The magistrate judge's findings, recorded in the Report and Recommendation, were based on specific facts from the record that the magistrate judge articulated and analyzed.  Though

---

[27]  R.57 at 2.

27

the details of the district court's independent review are scant, the district court was permitted to credit the magistrate judge's findings after reviewing the facts de novo.  The district court therefore did not abuse its discretion in denying Mr. Watkins's motion.[28]

## Conclusion

For the reasons stated in this opinion, the judgment of the district court is affirmed.

**AFFIRMED.**

---

[28] Having resolved the case on other grounds, we need not determine whether the "independent source" doctrine applies here.  See United States v. Noriega, 676 F.3d 1252, 1260 (11th Cir. 2012), cert. denied, 133 S. Ct. 957, 184 L. Ed. 2d 744 (2013).