[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11441

_____

D.C. Docket No. 2:14-cv-14221-DMM

TAYLOR ZIEGLER, SARINA WHITE, KENDALL MCCORMICK, HALEY
O'HANNA, KAELYN DRAZKOWSKI, TYLAR JORDAN, MORGAN
KLEABIR, SCOTT BROTHERS, and TIM ALLEN,

Plaintiffs - Appellants,

versus

MARTIN COUNTY SCHOOL DISTRICT,
JENSEN BEACH HIGH SCHOOL, GREG LAWS, in his official capacity as
Principal of Jensen Beach High School, THERESA IULIUCCI, in her official
capacity as Assistant Principal of Jensen Beach High School, LORIE KANE, in
her official capacity as Dean of Students of Jensen Beach High School, NORM
BRUSH, in his official capacity as Resource Officer of Jensen Beach High School,
and WILLIAM SNYDER, in his official capacity as Sheriff of Martin County,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 28, 2016)

Before MARCUS, JILL PRYOR and FAY, Circuit Judges.

FAY, Circuit Judge:

This appeal concerns constitutional violations alleged by students against high school officials for detaining them for breathalyzer tests prior to entering their Junior/Senior Prom as well as the high school, the school district, and county sheriff.  Summary judgment was granted to all defendants.  We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Jensen Beach High School ("JBHS"), located in Martin County, Florida, had scheduled its Junior/Senior Prom ("Prom") for May 3, 2014, from 8:00 P.M. until 12:00 A.M. at the Port St. Lucie Civic Center ("Civic Center").  Prom tickets specifically state "[n]o student will be admitted after 10 PM" and "[f]ailure to comply will result in expulsion from the dance and possible disciplinary actions that may include, but are not limited to, revoking of privileges, suspension, expulsion, etc."  Amended Complaint, Ex. D (Prom Rules, stated on the back of the Prom ticket).  JBHS has a Zero Tolerance Policy regarding alcohol, drugs, tobacco, and profanity on property controlled by Martin County School District or a JBHS activity outside Martin County.

Each JBHS student who desired to attend the Prom was required to sign the following Zero Tolerance Form:

2

Jensen Beach High School, along with the Martin County School District, has a **ZERO TOLERANCE POLICY** for alcohol, drugs, or tobacco. Any form of tobacco, alcoholic beverages, or drugs is not permitted on property owned or controlled by the Martin County School District or at any school-sponsored activity, including activities conducted outside of Martin County. Students and guests attending such activities and events may be subject to a breath test.

**Any form of profanity** is strictly prohibited. School policies are enforced.

*Please be advised that failure to uphold these rules will result in immediate disciplinary action and possible recommendation for expulsion.*

Please sign below to acknowledge receipt, and return this form to your class/club sponsor.

Amended Complaint, Ex. C.  Under the terms of the Zero Tolerance Form, attending students knew they would be required to pass a breathalyzer test before entering the Prom, if JBHS officials had reason to suspect they or their guests had consumed alcohol.[1]

---

[1] The School Board of Martin County has specific policies governing student search and seizure, including breathalyzer testing:

**SEARCH AND SEIZURE**

The School Board recognizes that the privacy of students or their belongings may not be violated by unreasonable search and seizure.
. . . .
School authorities may search the person or property, including vehicles, of a student, with or without the student's consent, whenever they reasonably suspect that the search is required to discover evidence of a violation of law or of school policies.  The scope of the search will be reasonable.

The nine appellants ("Students") were among approximately 37-40 students, including guests, who arrived at the Prom on a party bus.[2]  The Students, who had gone to dinner before going to the Prom, had rented the party bus from Go Florida Limo for May 3, 2014, from 5:30 P.M. until 11:30 P.M. for $3,000.  The rental was a one-way transportation to the Prom.  Go Florida Limo prohibits alcoholic beverages for passengers under age 21.  Upon entering the party bus, the students reported it had not been cleaned and used cups remained on board, apparently left from another event transportation.

The party bus arrived at the Civic Center at approximately 10:15 P.M.  As the student passengers exited to enter the Prom, Dean of Students Lorie Kane stopped them and informed their bus would be searched.  The party-bus passengers were asked to stand aside.  When all the students had exited the party bus, JBHS

---

*This authorization to search shall also apply to all situations in which the student is under the jurisdiction of the School Board.*

*Administrators are authorized to arrange for the use of a breath-test instrument for the purpose of determining if a student has consumed an alcoholic beverage. It is not necessary for the test to determine blood-alcohol level, since the School Board has established a zero tolerance for alcohol use.*

Amended Complaint, Ex. B (The School Board of Martin County, Bylaws & Policies, § 5771, Search and Seizure (emphasis added)).

[2] Students Scott Brothers and Tim Allen did not sign a Zero Tolerance Form, because they were guests and not JBHS students.

4

Resource Officer Norm Brush[3] asked the bus driver for permission to search the party bus for drugs and alcohol, which was given by the driver.  Officer Brush boarded the party bus and found an empty champagne bottle and twelve plastic cups inside the bus in plain view.  When questioned by Officer Brush, the bus driver said the champagne belonged to the student passengers on the party bus; all aboard the party bus, including the Students, stated the champagne bottle did not belong to them and denied knowledge of it.

Upon discovery of the champagne bottle and twelve plastic cups, Kane informed the party-bus passengers they would be required to pass a breathalyzer test before entering the Prom.  JBHS Principal Greg Laws called JBHS Assistant Principal Theresa Iuliucci, who had left the Prom to go home, and asked her to return to the Civic Center, because she was the only JBHS official certified to administer breathalyzer tests.  Because all but two of the breathalyzer-testing mouthpieces had been used in testing Prom attendees on an earlier bus, Principal Laws also directed Kane to go to JBHS to obtain additional mouthpieces for the breathalyzer testing of the students on the party bus.

---

[3] Officer Brush has been employed by the Martin County Sheriff's Office since February 2005. Under a written agreement between the Sheriff of Martin County and the School Board of Martin County, the Martin County Sheriff's Office had established a School Resource Officer Program that placed deputy sheriffs in public schools to assist in the prevention of juvenile delinquency. At the time of the Prom, May 3, 2014, Officer Brush was the School Resource Officer assigned to JBHS.  Aff. of Norm Brush at 2-3, ¶¶ 2, 3, 4 (Jan. 9, 2015).

Before, during, and after administration of the individual breathalyzer tests, Officer Brush, in uniform, stood guard over the students, who had arrived on the party bus. These students were assembled in line outside the Civic Center in sight of their classmates inside the Civic Center; they were instructed not to speak with classmates, who exited the Prom. It began to rain[4]; the students subsequently were moved to a covered area outside the Civic Center, where they continued to stand in line to be breathalyzed. Iuliucci drove back to the Civic Center and arrived at approximately 11:10 P.M. In addition to requesting Iuliucci's return, some of the students from the party bus asked if they could go home instead of being breathalyzed, but Officer Brush and Kane told them they had to wait outside until everyone on the party bus had been breathalyzed.

In her affidavit, Student Taylor Ziegler, who was first in line for breathalyzer testing, averred the students from the party bus had to wait outside for forty-five minutes for Kane to return to the Civic Center with the additional

---

[4] Appellant Haley O'Hanna testified at her deposition:

> Also it was drizzling. So we were outside in our prom dresses and there was no cover. We were outside in our prom dresses and our tuxes, all, and it's like starting to drizzle. I know drizzling doesn't sound that bad, but when it gets about an hour and a half, it's a lot. Especially when my hair is all done. I have a beautiful dress on. So that kind of stunk.
>      . . . . They have us detained and we all have to stand over here. None of us can leave. We're all like, we want to go, we don't even care about going to [the P]rom anymore. This is 45 minutes we have been standing out [t]here in the drizzling [rain] being detained and not allowed to leave.

Dep. of Haley O'Hanna at 56-57 (Dec. 16, 2014).

6

breathalyzer mouthpieces.  Aff. of Taylor Ziegler at 4, ¶ 28 (Jan. 21, 2015).   She

stated "[t]he students started to get frustrated and asked if they could call their

parents and go home.  Officer Brush and JBHS officials, however, told the students

they could not leave and had to wait outside until everyone was breathalyzed";

Ziegler "did not feel free to leave."  *Id.* at ¶¶ 31, 32.  Kane returned with the

breathalyzer mouthpieces around 11:10 P.M.; Iuliucci arrived at the Civic Center at

approximately the same time.  *Id.* at ¶¶ 33, 34.   Ziegler attested it took two to four

minutes for Iuliucci to administer a breathalyzer test to each student; the

breathalyzer test of the last student on the party bus was completed at

approximately 11:55 P.M.  *Id.* at 5 ¶¶ 37, 46.[5]  Thirty-eight students were

breathalyzed; all passed with 0.00 blood-alcohol content.  *Id.* at 6, ¶  48.  The Prom

ended at midnight.  Ziegler explained: "After waiting to be breathalyzed outside in

front of the [P]rom venue for over an hour and half and being told I could not go

home until every person finished the test, I missed my senior [P]rom."  *Id.* at ¶  50.

---

[5] The brief of appellees Martin County School District, JBHS, Laws, Iuliucci, and Kane states Iuliucci arrived at the Civic Center at 10:56 P.M., and Kane returned to the Civic Center with the additional mouthpieces at 11:04 P.M., which means the breathalyzer testing began after 11 P.M. Appellee's Br. at 6.  These appellees then state "Iuliucci completed the last breathalyzer test at 11:31 P.M." *Id.*  Using Student Ziegler's affidavit statement of two to four minutes per student for the breathalyzer test, appellees' representation of about 30 minutes to breathalyze 38 students does not compute mathematically.  Appellees acknowledge in a footnote "[t]he evidence appears to vary slightly regarding the amount of time it took to administer the breath tests, *but there does not appear to be a dispute that the tests were completed before midnight.*" *Id.* at n.1 (emphasis added).  Even appellants' counsel stated at oral argument the breathalyzer tests took 45 minutes to an hour.  Ziegler's averring the last breathalyzer test was completed at 11:55 P.M., while before midnight, when the Prom was over, means the students on the party bus missed their Prom, because of the time they were detained for all the breathalyzer tests to be completed. Ziegler Aff. at 5, ¶ 46.

The JBHS officials' purported purpose for not allowing any of the students from the party bus to enter the prom until all the students had been breathalyzed was to avoid unfairness resulting from the position of a particular student in line for a breathalyzer test.[6]

Principal Laws specifically overheard Student Kendall McCormick use profanity in a private conversation with her mother during preparation for and administration of the breathalyzer tests; McCormick was suspended for three days for violating the Zero Tolerance Policy.  Similarly, Student Kaelyn Drazkowski admitted to using profanity in the course of the breathalyzer testing; she also was suspended for three days for violating the Zero Tolerance Policy.  Drazkowski subsequently gave a televised interview describing the incident on a local news station.  After the story aired, Drazkowski was summoned to Kane's office, but she was not disciplined.  She alleges she was exercising her freedom of speech and thereafter no longer felt free to state her opinions.

The operative Amended Complaint was filed by Students against Martin County School District, JBHS, Laws, Iuliucci, Kane, Officer Brush ("School Defendants"), and Martin County Sheriff William Snyder in the Southern District of Florida.  They allege violations of the First, Fourth, and Fourteenth

---

[6] Despite allegations to the contrary in the Amended Complaint, the Students were allowed to use the bathroom with a teacher escort while waiting to be breathalyzed, which was confirmed by video evidence.  The Students were not patted down or searched by JBHS officials other than being administered a breathalyzer test.

Amendments to the United States Constitution and 42 U.S.C. § 1983. Specifically, they contend defendants' searching the party bus, breathalyzing Prom attendees, and seizing Prom attendees before and after administering breathalyzer tests violated the Fourth Amendment; regulating the speech of certain students and retaliating against Drazkowski for her speech violated the First Amendment; breathalyzing students who arrived by party bus or limousine under JBHS policy violated the Equal Protection Clause of the Fourteenth Amendment; and failing to train its police officers properly regarding the Fourth Amendment by Martin County Sheriff's Office violated § 1983. The Students sought compensatory and punitive damages, attorney's fees, costs of suit, and declaratory relief regarding the alleged unconstitutionality of the defendants' conduct. The individual School Defendants pled the affirmative defense of qualified immunity. Motions for summary judgment were filed by the individual School Defendants as well as Martin County School District, JBHS, and Sheriff Snyder. The district judge granted all the defendants' motions for summary judgment; this timely appeal followed.

## II. ANALYSIS

We review de novo the grant of summary judgment and construe the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Baloco v. Drummond Co.*, 767 F.3d 1229, 1246 (11th Cir.

2014).  We apply the same legal standards that bound the district judge.  *Shuford v.*

*Fid. Nat'l Prop. & Cas. Ins. Co.*, 508 F.3d 1337, 1341 (11th Cir. 2007).  We

review de novo a district judge's "interpretation and application of the law."

*NAACP, Jacksonville v. Duval Cnty. Sch.*, 273 F.3d 960, 965 (11th Cir. 2001).

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The determinative inquiry is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is

so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).

## A. Fourth Amendment: Search and Seizure

At the outset, there is no dispute the students on the party bus arrived at the

Civic Center for the Prom after 10 P.M. on May 3, 2014.  The JBHS Prom Rules

definitively state "[n]o student will be admitted after 10 P.M."  Amended

Complaint, Ex. D, ¶ 9 (Prom Rules).  Because of their arrival at the Civic Center

for the Prom after 10 P.M., it is undisputed the students on the party bus could

have been denied entrance to the Prom upon arrival had the JBHS officials strictly

enforced the clearly stated Prom Rules.  The searches and seizure about which the

Students complain likely would have been alleviated, if they had arrived timely at

the Civic Center for the Prom.

The Students have focused their Fourth Amendment appeal on the cumulative time period they were detained for the search of the party bus and breathalyzer tests.  They state the district judge "on multiple occasions characterized this case as an allegation by the Students that the Defendants violated their constitutional rights by delaying their entrance to [the P]rom.  This case is not about the Prom; *it is about a denigrating two-hour detention with no cause*."  Principal Br. of Appellants at 11 (emphasis added).

Our Fourth Amendment analysis under the governing law will examine the separate time periods the Students were detained after arrival at the Civic Center for the Prom.  We will address each alleged Fourth Amendment violation following the students' arrival at the Civic Center on the party bus.  The cumulative time the Students were detained while the JBHS officials conducted their investigative searches, however, effectively caused the Students to miss their Prom, which ended at midnight.

**1. Legal Standards for School Searches Involving Students**

"[T]he touchstone of the constitutionality of a governmental search" is "reasonableness."  *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*,  536 U.S. 822, 828, 122 S. Ct. 2559, 2564 (2002) (internal quotation marks omitted) (concerning constitutionality of high school, urinalysis-drug-testing policy).  "Fourth Amendment rights, no less than First and Fourteenth Amendment

11

rights, are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656, 115 S. Ct. 2386, 2392 (1995) (challenging random urinalysis-drug testing for students participating in interscholastic athletics).  "Securing order in the school environment sometimes requires that students be subjected to greater controls than those appropriate for adults."  *Earls*,  536 U.S. at 831, 122 S. Ct. at 2565.  While "[t]he probable-cause standard . . . is peculiarly related to criminal investigations," the Supreme Court has "held that a warrant and finding of probable cause are unnecessary in the public school context because such requirements would unduly interfere with the maintenance of the swift and informal disciplinary procedures that are needed" in schools.  *Id.* at 828-29, 122 S. Ct. at 2564 (citations, internal quotation marks, and alteration omitted).  The Court has recognized "in certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion."  *Id.* at 829, 122 S. Ct. at 2564 (citation, internal quotation marks, and alteration omitted).

"[T]he legality of a search of a student should depend simply on the reasonableness, *under all the circumstances*, of the search."  *New Jersey v. T.L.O.*,

12

469 U.S. 325, 341, 105 S. Ct. 733, 742 (1985) (emphasis added).  Determining the reasonableness of a search involving students "involves a twofold inquiry": (1) "whether the action was justified at its inception," and (2) "whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place."  *Id.* at 341, 105 S. Ct. at 742-43 (citation and internal quotation marks omitted).  "Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school."  *Id.* at 341-42, 105 S. Ct. at 743 (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968)) (footnotes omitted).

Questions regarding the reasonableness of a search or seizure based on established facts must be decided by the trial judge and not the jury.  *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006) ("Where the historical facts giving rise to the stop and detention are undisputed, the only question is one of law, namely, whether the stop and detention, considered in light of the totality of the circumstances, were reasonable."); *United States v. Jones*, 269 F.3d 919, 927 (8th Cir. 2001) ("The ultimate determination of reasonableness under the Fourth Amendment is a question of law which we review *de novo*.").  These applicable

reasonableness principles guide our analysis of each search and seizure involving the Students following their arrival at the Civic Center for the Prom.

### 2. Search of the Party Bus

#### a. Expectation of Privacy in the Rental Party Bus

The Students initially argue that, because the Prom was not at JBHS or during school hours, it did not qualify as the type of school event for which the *T.L.O.* reasonableness standard was applicable.  The evidence, however, is undisputed the Prom was organized by JBHS, and it was supervised and controlled by JBHS officials.  Prom tickets were purchased directly from JBHS; the JBHS administration had to approve the students who desired to attend; and the students, by signing their Prom tickets, acknowledged JBHS rules applied and agreed to abide by them.  The Prom Rules on the back of the Prom ticket state JBHS students attending the Prom had to show valid JBHS identification to enter the Prom.  The Zero Tolerance Form, which all JBHS students attending the Prom had to sign, specifically states it applied to off-campus activities, "including activities conducted outside of Martin County."  Amended Complaint, Ex. C.  The record supports the conclusion this was a JBHS event that provided diminished privacy for students who voluntarily attended, making the *T.L.O.* reasonableness standard applicable.  The rationale for using the reasonableness standard outside a traditional school setting was explained by the Eighth Circuit Court of Appeals:

> The fact that the search occurred away from what one would consider traditional school grounds similarly does not elevate the Fourth Amendment standard to one of probable cause.  The nature of administrators' and teachers' responsibilities for the students entrusted to their care, not school boundary lines, renders the Fourth Amendment standard in the public-school context less onerous.

*Shade v. City of Farmington*, 309 F.3d 1054, 1061 (8th Cir. 2002);

*see Earls*, 536 U.S. at 837-38, 122 S. Ct. at 2568-69 (upholding under the Fourth Amendment the constitutionality of the school-district policy of randomly urinalysis-drug testing students participating in extracurricular activities); *Vernonia Sch. Dist.*, 515 U.S. at 664-65, 115 S. Ct. at 2396-97 (rejecting Fourth Amendment challenge to random urinalysis-drug testing of student athletes).

The Students also contend they had a legitimate expectation of privacy in the party bus for the duration of their rental, which was from 5:30 P.M. until 11:30 P.M. on May 3, 2014, for the Prom.  There is no dispute, however, the Students did not expect additional transportation on the party bus once they arrived at the Civic Center for the Prom.[7]   All the students had exited the party bus when Kane told them to stand together away from the bus before entering the Prom, because the party bus was going to be searched.

---

[7] The party bus had picked up the Students from the Civic Center on May 3, 2014, driven them to a local park for pictures in their Prom attire and then to West Palm Beach for dinner, after which the party bus took them back to the Civic Center for the Prom.  Some of the Students had driven earlier to the Civic Center, where they had left their cars to depart after the Prom.  Others were to be picked up by their parents following the Prom.

15

The student passengers on the party bus had left no personal belongings on the bus to indicate they intended to return to the bus at any point after exiting to enter the Prom.  To assert a Fourth Amendment violation, an individual must establish he or she had a legitimate expectation of privacy in the place searched. *Rakas v. Illinois*, 439 U.S. 128, 148-49, 99 S. Ct. 421, 433-34 (1978); *United States v. Brazel*, 102 F.3d 1120, 1147-48 (11th Cir. 1997).   "Establishing a legitimate expectation of privacy is 'a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *United States v. Ford*, 34 F.3d 992, 995 (11th Cir. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 516 (1967) (Harlan, J., concurring)).  A reasonable expectation of privacy can be abandoned.  *Abel v. United States*, 362 U.S. 217, 241, 80 S. Ct. 683, 698 (1960); *United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982).  "'Abandonment is primarily a question of intent, and may be inferred from words spoken, acts done and objective facts.'" *Pirolli*, 673 F.2d at 1204 (quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973) (en banc)).

The students who had occupied the party bus to the Civic Center left no personal belongings whatsoever on the bus when they exited to go into the Prom.  None of them objected when they were told the party bus would be searched or

mentioned they needed to return to the bus for any reason, which showed they did not intend to return to the bus.  Irrespective of the contract stating the rental terminated at 11:30 P.M., the students who had arrived at the Civic Center at approximately 10:15 P.M. were not relying on the party bus to transport them after the Prom and had abandoned the bus, when they exited to enter the Prom.  We conclude the Students have not established an actual or reasonable expectation of privacy in the party bus, which they had abandoned once they had exited for the Prom.

### b. Consent

After all the students on the party bus voluntarily had exited at the Civic Center to attend the Prom and were standing aside waiting for the inspection of the bus, Officer Brush asked the bus driver for permission to board the bus to inspect it.  He describes the search in his affidavit:

> After all students exited the bus, I approached [and] asked the bus driver if he was waiting to transport the students home at the end of [the P]rom. The bus driver indicated that it was only a one way trip, and that he was not waiting for the students.  I then asked the bus driver for permission to board the bus and check for any left property or contraband.  The bus driver said to "go ahead", and he gestured with his hands for me to enter the bus.  There were no students on the bus at the time I entered the bus.  At the time I approached the bus, I did not possess any reasonable suspicion to enter the bus and conduct a search.  However, I did inquire of the bus driver if he would give me permission to inspect it.  Had the bus driver said no, I would not have entered the bus.
> . . . .

17

> After obtaining consent from the bus driver to look around the party bus, I boarded the bus, and immediately upon stepping in the aisle, I observed approximately one dozen red empty Solo cups in an island bar and an open bottle of Venue DU Verney sparkling wine, 750 ml ALC 11% by volume. The empty bottle was room temperature to the touch. The island bar and its contents were in plain view and centrally located on the driver's side of the bus.

Aff. of Norm Brush at 3, ¶ 6, 4, ¶ 8 (Jan. 9, 2015) (citation omitted). When Officer Brush asked the driver about the champagne, the driver told him it belonged to the students, whom he had transported to the Prom.

The Students argue the bus driver did not have authority to permit Officer Brush to inspect the party bus. "'A search of property, without warrant or probable cause, is proper under the Fourth Amendment when preceded by valid consent.'" *United States v. Harris*, 526 F.3d 1334, 1339 (11th Cir. 2008) (quoting *United States v. Dunkley*, 911 F.2d 522, 525 (11th Cir. 1990)). "Valid consent may be granted by a person with actual or apparent authority to give permission to search." *United States v. Watkins*, 760 F.3d 1271, 1279 (11th Cir. 2014) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186-89, 110 S. Ct. 2793, 2800-01 (1990)). "A third party who has 'common authority over or other sufficient relationship to the premises or effects sought to be inspected' may give valid consent to search an area." *Harris*, 526 F.3d at 1339 (quoting *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974)).

The company from which the party bus was rented provided the driver for the transportation.  The rental contract gives the driver discretion to drop off any unruly passengers.  Consequently, the driver had authority over the party bus and the student passengers under the rental contract.  Because all the students being transported to the Prom had exited the party bus, when Officer Brush boarded the bus and asked permission to inspect it, the driver was the sole occupant.  *See United States v. Eldridge*, 984 F.2d 943, 948 (8th Cir. 1993) ("The driver of a car has the authority to consent to search of that vehicle.  As the driver, he is the person having immediate possession of and control over the vehicle.").  From Officer Brush's perspective, the driver had apparent authority to consent to search of the party bus.  Therefore, the search of the party bus conducted by Officer Brush did not violate the Students' Fourth Amendment rights.

### 3. Detention of Students for Breathalyzer Testing

#### a. Detention Before Breathalyzer Testing

With valid consent of the driver, Officer Brush boarded the party bus and immediately discovered the empty champagne bottle and twelve plastic cups in plain view.  When he left the bus holding the champagne bottle, Kane told the student passengers on the party bus, who had been waiting outside the bus, to stand in a straight line to be breathalyzed.  Officer Brush said he had only two breathalyzer mouthpieces, and the students would have to wait until someone

19

drove back to JBHS to get more mouthpieces.  In her affidavit, Taylor Ziegler

stated "[s]ome of the students asked whether two of the students could take the test

and go inside the [P]rom, but they were told that they had to wait outside in the

line until they picked up more [breathalyzer] sticks and *until everyone was finished*

*being  breathalyzed*."[8]  Aff. of Taylor Ziegler at 4, ¶ 24 (emphasis added).  The

Zero Tolerance Form that all the student Prom attendees had signed states they and

their guests may be subjected to a breath test for JBHS activities conducted outside

of  Martin County, which put them on notice they could be breathalyzed.

Iuliucci, who had gone home, was called by Principal Laws to return to the

Civic Center to administer the breathalyzer tests to the student passengers on the

party bus.  He also asked Kane to drive to JBHS to obtain additional breathalyzer

mouthpieces for the testing.  When it began to rain, the student line was moved to a

covered area of the Civic Center.  Iuliucci and Kane returned to the Civic Center at

approximately 11:10 P.M.  Ziegler attested the "students waited outside in a line

for 45 minutes to an hour for the breathalyzer sticks to arrive."  *Id.* at ¶ 28.

The initial detention of the students on the party bus for breathalyzer testing

meets the *T.L.O.* standard of being justified at its inception, because it was

reasonably related to the circumstances that caused the detention: to determine if

---

[8] Even with two available mouthpieces, which could have been used for breathalyzing two students, Iuliucci, the only JBHS official certified to administer a breathalyzer test, had left the Civic Center to return home and was not there to test the students.

20

students on the party bus had been drinking.  469 U.S. at 341, 105 S. Ct. at 742-43. Officer Brush had found an empty champagne bottle and twelve plastic cups on the party bus.  When questioned by Officer Brush, the bus driver had said the champagne belonged to the students on the party bus.  These cumulative factual findings by Officer Brush gave reasonable and sufficient cause to believe alcoholic beverages had been consumed on the party bus by the student passengers.

Because of the public school setting, where "the State is responsible for maintaining discipline, health, and safety" of the students, the School Defendants had a legitimate government interest in conducting the breathalyzer tests on the students from the party bus before allowing them to enter the Prom or to drive themselves home.  *Earls*, 536 U.S. at 830, 122 S. Ct. at 2565.  If the consumption of alcohol was proved, then it violated the JBHS Zero Tolerance policy for school-sponsored activities outside Martin County and state law regarding underage drinking.  Administering a minimally invasive breathalyzer test to the student passengers on the party bus was the only reasonable and determinative method to know which students might have consumed alcohol in violation of the JBHS policy.[9]  "'[A] school official may detain a student if there is a reasonable basis for

---

[9] While "the administration of a breath test is a search," the Supreme Court has recognized that "the physical intrusion[, consisting of blowing "into a straw-like mouthpiece that is connected by a tube to the test machine,"] is almost negligible," and it entails "a minimum of inconvenience"; a breathalyzer test is unlikely to cause  embarrassment and "does not implicate significant privacy concerns." *Birchfield  v. N. Dakota*, 136 S. Ct. 2160, 2173, 2176, 2178 (2016) (citations, internal quotation marks, and alteration omitted).

21

believing that the pupil has violated the law or a school rule.'" *S.E. v. Grant Cnty. Bd. of Educ.*, 544 F.3d 633, 641 (6th Cir. 2008) (quoting *Wofford v. Evans*, 390 F.3d 318, 326 (4th Cir. 2004)); *see Harris v. United States*, 928 F.2d 1113, 1117 (11th Cir. 1991) ("Where . . . the initial stop was legal, the [officer] had the duty to investigate suspicious circumstances that then came to his attention."). The School Defendants did not violate the Students' Fourth Amendment rights, because they (1) had a reasonable basis for believing the Students had violated the Prom Rules imposed by JBHS and state law, and (2) the detention was reasonably related in scope.

The initial detention of the students on the party bus for approximately forty-five minutes to an hour was waiting for the breathalyzer testing to begin. They waited for Kane to go to JBHS to obtain additional breathalyzer mouthpieces for the breathalyzer testing and return to the Civic Center and for Iuliucci to return to the Civic Center from her home to administer the breathalyzer tests to the individual students. As the district judge noted, the students on the party bus arrived well after the 10:00 P.M. deadline for arrival at the Prom. This could have been the reason Iuliucci, the only JBHS official certified to administer breathalyzer tests, had departed. Consequently, the Students cannot fault the School Defendants for not having someone on site to administer the breathalyzer tests immediately. In addition, the judge further concluded the prior use of numerous breathalyzer

22

mouthpieces was unforeseen, which resulted in the depletion of mouthpieces, when the Students arrived on the party bus. Under the particular circumstances of this Prom night, the initial waiting period for the breathalyzer mouthpieces and a trained individual to administer the breathalyzer tests was reasonable, because it was necessary for the testing. *See United States v. French*, 974 F.2d 687, 690 (6th Cir. 1992) (determining detention of defendants while waiting for a drug dog located fifty miles away was reasonable).

### b. Detention to Administer the Breathalyzer Tests

Even if the seizure or detention of the students on the party bus was justified at its inception, the Students argue on appeal the actual administration of the breathalyzer tests was unreasonable in two respects. They initially contend it was unreasonable for the School Defendants to detain them as a group until each student from the party bus was breathalyzed, approximately forty-five minutes to an hour. Their related and primary argument is, once each student was breathalyzed and shown to have no alcohol in his or her system, the student should have been free to leave, whether to go into the Prom; drive away in his or her car, for those who had driven earlier to the Civic Center; or go home with parents.

The School Defendants maintain keeping all the students together until the breathalyzer testing was completed was done for fairness, so the students tested at the front of the line would not be advantaged by being able to go into the Prom,

23

while the rest waited to be breathalyzed.  The district judge found the School

Defendants' decision to detain all the students from the party bus together until all

had been breathalyzed was reasonable under the circumstances to maintain order,

since Deputy Brush had reported some of the students had become disruptive while

waiting for all the students to be breathalyzed.  Neither rationale as a basis for

holding all the students from the party bus until all had been breathalyzed

satisfactorily answers the core question presented in this case: once a student from

the party bus was found to be alcohol free by the breathalyzer test, why was he or

she not free to go, whether into the Prom or to leave by personal vehicle or with

parents?

The Supreme Court has held breath and urine tests implicate the Fourth

Amendment.[10]  *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614-16, 109 S.

Ct. 1402,  1411-13 (1989); *see Maryland v. King*, __ U.S. __, __, 133 S. Ct. 1958,

1969 (2013) (recognizing specifically administration of a breathalyzer test

constitutes a search under the Fourth Amendment).  "Whenever an officer restrains

the freedom of a person to walk away, he has seized that person." *Tennessee v.*

*Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699 (1985).  We have determined the

detention of the students on the party bus was reasonable while they waited to be

---

[10] The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

breathalyzed, because of the champagne bottle and cups Officer Brush had found during his search of the bus and the driver's verification the alcohol belonged to the student passengers. These factual findings indicated at least some of the student Prom attendees on the party bus might have been drinking.

But the continued detention of *all the students* on the party bus until *all had been breathalyzed* is another matter. We now hold, when government officials need to conduct breathalyzer or urine tests on students, the testing must be accomplished in a reasonably expeditious time period; once exonerated by the test, the student must be free to go. Like urine testing for drugs, breathalyzer testing for alcohol must be conducted quickly before the alcohol or drugs physiologically dissipate in the student's system. *See Schmerber v. California*, 384 U.S. 757, 770, 86 S. Ct. 1826, 1835, 1836 (1966) (noting "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system," which presents the risk the "evidence may disappear unless there is an immediate search"). Delay in testing, certainly a substantial delay, would render an inaccurate result. Testing must be accomplished in an objectively reasonable time under the circumstances.

When a student is tested as alcohol or drug free, there is no justification for continuing to detain the student with such definitive exculpatory evidence. We conclude each student from the party bus who tested alcohol free reasonably

25

should have been free to leave without being detained until all the students had been tested. After their being delayed for the breathalyzer testing, some no longer wanted to go to the Prom, which was about to end at midnight. Detaining a student after he or she was found to be alcohol free was not "reasonably related" to the reason for the detention "in the first place" of determining if the student passengers on the party bus had been drinking. *T.L.O.*, 469 U.S. at 341, 105 S. Ct. at 743.

### c. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (citation and internal quotation marks omitted). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002) (citation and internal quotation marks omitted).[11] "Because qualified immunity is an immunity from suit rather than a mere defense to liability[,] it is effectively lost if a case is erroneously

---

[11] We recognize there is an exception, when facts are egregious, as in *Hope*, where Alabama prison guards who had handcuffed an inmate to a hitching post in the hot summer sun without a shirt, water or bathroom breaks for seven hours violated the Eighth Amendment for cruel and unusual punishment, which made them ineligible for qualified immunity. *See also Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002) (denying qualified immunity to police officer, who used excessive force in arresting a motorist for honking her horn in busy traffic). The circumstances in this case, resulting in the Students' detention, however, do not rise to that level.

26

permitted to go to trial." *Pearson*, 555 U.S. at 231, 129 S. Ct. at 815 (citation and internal quotation marks omitted). "The essence of qualified immunity analysis is the public official's objective reasonableness, regardless of his underlying intent or motivation." *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004).

For qualified immunity to apply, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations and internal quotation marks omitted). Clearly, the individual School Defendants, Laws, Iuliucci, Kane, and Officer Brush were acting within the scope of each's respective authority at JBHS in the search of the party bus, which led to the subsequent detention of all the students on the bus for breathalyzer testing for alcohol, the crux of the Students' case. At oral argument, their counsel conceded he did not know of any case directly on point, where students were detained for a breathalyzer or drug test and, although tested alcohol or drug free, had to remain until all students were tested. We have not found such a case either. On the facts of this case, the individual School Defendants are entitled to qualified immunity, because there was no binding clearly established law[12] at the time to inform them

---

[12] "In this circuit, the law can be clearly established for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Lee*, 284 F.3d at 1197 n.5 (citation and internal quotation marks omitted).

they had violated the party-bus students' Fourth Amendment rights by continuing to detain them after they were breathalyzed and found to be alcohol free.[13]

### d. Remaining Defendants

The remaining defendants are Martin County School District, JBHS, and Sheriff Snyder. On appeal, the Students have not addressed Martin County School District and JBHS. Therefore, they have abandoned any arguments on appeal regarding these defendants. *See United States v. Ardley*, 242 F.3d 989, 990 (11th Cir. 2001) ("[W]e apply our well-established rule that issues and contentions not timely raised in the briefs are deemed abandoned." (collecting cases)).

In their reply brief, the Students complain the district judge did not address their claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978), which held a municipality is not liable for constitutional deprivations under respondeat superior, unless the constitutional violation resulted from a policy or

---

[13] The Students' contention JBHS had a de facto breath-test policy only for students arriving for the Prom in party buses or limousines, which violated their Fourteenth Amendment, equal protection rights is unavailing. There is no evidence in the record that such a policy existed, formally or informally. "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S. Ct. 2326, 2331 (1992). "[U]nless the case involves a suspect class or a fundamental right, the Equal Protection Clause requires only that the classification be rationally related to a legitimate state interest." *Bah v. City of Atlanta*, 103 F.3d 964, 966 (11th Cir. 1997) (citation and internal quotation marks omitted). The School Defendants supervising the Prom reasonably and rationally could have concluded students who had rented a limousine or party bus to attend the Prom would not be driving to the Civic Center and would be more likely to consume alcohol or drugs before arriving at the Prom. That would be a reason "rationally related to a legitimate state interest" for treating students arriving at the Prom in limousines and party buses differently from those who drove themselves or were driven by parents or others. *Id.*

custom.  "[I]nadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*,  489 U.S. 378, 388, 109 S. Ct. 1197, 1204 (1989).  A finding of deliberate indifference requires evidence the municipality was on notice, meaning a plaintiff "must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).  There was no notice to Sheriff Snyder about how Officer Brush handled the detention for breathalyzer testing the night of the Prom, because there is no evidence in the record that such a situation had occurred before this instance.  Moreover, we have determined Officer Brush is entitled to qualified immunity, because holding students from the party bus after they had passed the breathalyzer test until all the student passengers had been breathalyzed was not clearly established law at that time.  Consequently, there can be no liability for Sheriff Snyder for failing to train Officer Brush in this regard.

## B. First Amendment

Students Kaelyn Drazkowski and Kendall McCormick allege their First Amendment rights were violated, when they were suspended three days each for cursing in the course of the breathalyzer detention.  The Zero Tolerance Form

29

plainly states: "**Any form of profanity** is strictly prohibited."  Amended

Complaint Ex. C (Zero Tolerance Form).  Consequently, they were on notice

cursing was prohibited at JBHS activities, including an event outside of Martin

County.  The School Board permits discipline for students using profanity at a

school-sponsored event; the Zero Tolerance Policy form states "[s]chool policies

[will be] enforced" at the Prom.  *Id.*  It is uncontested the Prom was a JBHS-

sponsored event.

While recognizing "[t]he First Amendment guarantees wide freedom in

matters of adult public discourse," the Supreme Court has differentiated "the

constitutional rights of students in public school are not automatically coextensive

with the rights of adults in other settings."  *Bethel Sch. Dist. No. 403 v. Fraser*, 478

U.S. 675, 682, 106 S. Ct. 3159, 3164 (1986) (citing *T.L.O.*, 469 U.S. at 340-42,

105 S. Ct. at 742-43).  "Surely it is a highly appropriate function of public school

education to prohibit the use of vulgar and offensive terms in public discourse";

"[n]othing in the Constitution prohibits the states from insisting that certain modes

of expression are inappropriate and subject to sanctions."  *Id.* at 683, 106 S. Ct. at

3164.  The First Amendment rights of students "must be applied in light of the

special characteristics of the school environment."  *Hazelwood Sch. Dist. v.*

*Kuhlmeir*, 484 U.S. 260, 266, 108 S. Ct. 562, 567 (1988).  Consistent with these

principles, the JBHS officials were constitutionally correct in disciplining

Drazkowski and McCormick for their cursing during the breathalyzer testing for the Prom, because "it was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education." *Bethel Sch. Dist.*, 478 U.S. at 685-86, 106 S. Ct. at 3165.  No First Amendment violation occurred to Drazkowski and McCormick for their respective suspensions for knowingly failing to abide by JBHS rules during the breathalyzer-testing process.

Drazkowski pursues on appeal her claim of retaliation for her First Amendment right to express her views regarding the Prom night, breathalyzer-testing incident during a news program on a local station.  But JBHS officials did not punish her for this speech; instead, they voiced strong disapproval, and Drazkowski contends punishment was threatened.  *See Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 609 (6th Cir. 2008) (recognizing in a § 1983 case "absent proof of a concrete harm, where a First Amendment plaintiff only alleges inhibition of speech, the federal courts routinely hold that no standing exists").  The district judge did not rule on Drazkowski's retaliation claim.  At oral argument, the Students' counsel agreed we could address this issue de novo, if we did so purely on a legal basis without the need for factual findings.

Accordingly, we have recognized the elements of a retaliation claim under the First Amendment: (1) a plaintiff must establish her speech "was

31

constitutionally protected," (2) the "retaliatory conduct adversely affected the protected speech," and (3) "there is a causal connection between the retaliatory action[] and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).   We adopted for this circuit a definition of an adverse action, the second element of a retaliation claim: "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* at 1254. Drazkowski suffered no adverse action, because JBHS officials did not discipline her; they simply expressed their displeasure at her describing the breathalyzer testing the night of the Prom on a local news station.  Moreover, she did so in a context away from JBHS, where she broke no JBHS rules.  Drazkowski was bold enough to tell her view of the Prom night, breathalyzer incident on a local news program, even though she had been disciplined for cursing during the breathalyzer testing, and it was not the first time Drazkowski had been disciplined for cursing at JBHS.  Her history of failing to follow JBHS rules regarding her speech shows she was not deterred by actual discipline, suspension.  As a person of ordinary firmness, Drazkowski clearly was not and would not be deterred in expressing her views concerning the Prom night, breathalyzer testing outside JBHS, because JBHS officials merely talked to her about it and did not punish her for it.  On this

record, Drazkowski has failed to establish a claim of retaliatory conduct by JBHS officials.

## III. CONCLUSION

As we have explained, the Students have not established they should succeed on any of their allegations concerning their Fourth Amendment detention by the School Defendants for breathalyzer testing on their Prom night or their First Amendment and Fourteenth Amendment claims.  In according the School Defendants qualified immunity, we have established the requirement in our circuit that, when a student is exonerated by a test with an immediate result, such as a breathalyzer or urine test, that student can no longer be held after being shown to be alcohol or drug free.  The district judge correctly granted summary judgment to all the defendants.

**AFFIRMED.**