**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 23-13249

————————————————

OLIVIA COLEY-PEARSON,

*Plaintiff-Appellant,*

*versus*

EMILY MISTY MARTIN,
    In her official capacity and individually,
    a.k.a. Misty Hayes,
COFFEE COUNTY,
    by and through the Coffee County Board of Elections,

*Defendants-Appellees,*

JOE STEWART,
    In his official capacity and individually,
ROBERT SPRINKLE,
    In his official capacity and individually,
SHANE EDMISTEN,
    In his official capacity and individually,

*Defendants.*

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 5:20-cv-00151-LGW-BWC

_____

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

BRANCH, Circuit Judge:

Plaintiff Olivia Coley-Pearson appeals the district court's grant of summary judgment to Defendants Emily Misty Martin and Coffee County, Georgia, in her 42 U.S.C. § 1983 suit alleging claims for violations of the First and Fourth Amendments.

During the early voting period of the 2020 general election, Coley-Pearson went to a polling site in Coffee County to assist a voter with voting. While inside the polling site, Coley-Pearson had an altercation with Martin, the Coffee County Elections Supervisor. After the two screamed at each other, the police were called. Coley-Pearson left, and City of Douglas police sergeant Joe Stewart responded to the scene and spoke with Martin and other witnesses.

Later that day, Coley-Pearson returned to the same polling site to assist another voter. Again, the police were called. Sergeant Stewart responded, and he served Coley-Pearson with a criminal trespass warning and told her to leave the polling site and its parking lot. After Coley-Pearson refused to leave, she was arrested.

Coley-Pearson then sued Martin and Coffee County, claiming that the criminal trespass warning issued by Sergeant

Stewart violated the First Amendment and that her arrest violated the Fourth Amendment.  The district court granted summary judgment to Martin and Coffee County mainly because Sergeant Stewart, a City of Douglas police officer, issued the trespass warning and arrested Coley-Pearson; Martin did not.

On appeal, the parties dispute the merits of both the criminal trespass warning and the arrest.  After careful review and with the benefit of oral argument, we conclude that Coley-Pearson's claims fail for one reason: Coley-Pearson has failed to present enough evidence for a reasonable jury to conclude that Martin—rather than Sergeant Stewart—caused her alleged injuries.  Because § 1983 requires a plaintiff to show that the defendants caused the plaintiff's injuries, and Coley-Pearson has failed to make that showing here, we affirm the district court's grant of summary judgment to Martin and the County.

## I.    Background

### A.    Factual Background[1]

Olivia Coley-Pearson is a resident of Coffee County, Georgia, and serves on the Board of Commissioners for the City of Douglas.  She is committed "to increasing voter turnout and

---

[1] Because the case comes to us at the summary-judgment stage, we "construe the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party"—here, Coley-Pearson. *Ziegler v. Martin Cnty. Sch. Dist.*, 831 F.3d 1309, 1318 (11th Cir. 2016).

4                    Opinion of the Court                    23-13249

voter participation" and, to that end, "provide[s] transportation and voting assistance" to those in need.

In October 2020, Coley-Pearson helped Crystal Hill, who has difficulty reading, vote during the early voting period of the 2020 general election.  After Hill voted and printed out her ballot, Coley-Pearson walked Hill to the County's new scanning machines to help Hill cast the ballot.  According to Coley-Pearson, she asked the poll worker "in a normal voice" what the buttons on the new scanning machine were for.

As soon as she asked the question, Coffee County Elections Supervisor Misty Martin approached and "began hollering" at Coley-Pearson "not [to] touch any buttons."  Apparently, an election observer named Cathy Latham had told Martin that Coley-Pearson "was over there doing stuff that she don't [sic] supposed to do."  That is, Latham had told Martin that Coley-Pearson was "doing [something] wrong," and Latham's comment was at least in part why Martin first approached Coley-Pearson.[2]  Martin also testified that she overheard Coley-Pearson's questions about the buttons.

---

[2] Larry Nesmith, who was working as a "monitor" for "the Democratic Party of Georgia" on the day in question, is the person who testified about what Latham told Martin.  According to Nesmith, Latham reported that Coley-Pearson was doing something "wrong"—not just that she was assisting voters. He also confirmed that Martin had seen Coley-Pearson assisting voters in the past and had not prevented Coley-Pearson from doing so.

After Martin approached, Coley-Pearson again asked what the buttons on the scanning machine were for, and Martin said that she did not know. Coley-Pearson replied, "[S]o you're the supervisor and you don't know?" Martin then instructed someone to call 911.[3]

As Coley-Pearson started to leave the building, Martin yelled at her. Martin shouted that Coley-Pearson had previously gotten in trouble for similar conduct—*i.e.*, improperly touching buttons to help another individual cast a ballot.[4] After hearing that accusation, Coley-Pearson started raising her voice, too, and accused Martin of lying. Eventually, Coley-Pearson walked out to her car and left.

Sergeant Joe Stewart of the City of Douglas Police Department arrived in response to the 911 call and investigated the incident. Sergeant Stewart testified in his deposition that he heard Martin apologizing to other voters for a disruption and that the "general demeanor" of the polling site was off, as if there had been an issue.

Martin told Sergeant Stewart that she desired at least some sort of ban for Coley-Pearson. While discussing the incident with

---

[3] Martin stated in her deposition that she requested police assistance because the situation was "getting out of hand."

[4] In 2016, a Georgia grand jury indicted Coley-Pearson for improper conduct related to voting—specifically, two counts of improperly assisting in the casting of a ballot and two counts of false swearing—during the 2012 election. Three of the four counts against her were dismissed, and a jury ultimately acquitted her of the final count.

Sergeant Stewart, Martin said, "I don't care what I got to file, what I got to do, she is not to come back in my office. If I have to say I feel threatened, I don't care. Because I do . . . she was all up in my face." Martin also made a written statement in which she stated that she requested that Coley-Pearson "be banned from the location and any polling place for 2020." Besides Martin, Sergeant Stewart spoke to nine other witnesses, none of whom contradicted Martin's claim that Coley-Pearson was part of a "disturbance" at the polling location.

After speaking with Sergeant Stewart, Martin contacted the county attorney to confirm that, in her role as Coffee County's Elections Supervisor, she had the authority to ban Coley-Pearson from the polling location and the elections office. According to Martin, the county attorney relayed that he thought she had the authority "to ask [Coley-Pearson] to leave the premises because she was being disruptive." The attorney, however, advised her to contact a majority (three members) of the Board of Elections "to get a poll" on if they thought she had the authority to ban someone.

Martin then spoke with three members of the Board—Matthew McCullough, Eric Chaney, and Ernestine Thomas-Clark. She spoke with McCullough over the phone, who told her that he thought she "probably" had the authority as supervisor "to remove someone from the premises if they were creating a problem." The conversation lasted for "[j]ust a few minutes," and McCullough clarified that the only question he answered was whether, in

general, Martin "ha[d] the authority to ban people." Martin also spoke with Chaney over the phone, but he did not remember the phone call. Lastly, she spoke with Thomas-Clark in person, who agreed that Martin had the authority to ask Coley-Pearson "to leave." Thomas-Clark did not recall discussing a ban. Thomas-Clark also stated that the Board did not "vote" on anything, including whether to ban Coley-Pearson. Rather, according to Thomas-Clark, the Board was simply "confirming whether or not [Martin] had the authority" to "ask [Coley-Pearson] to leave."

After Martin asked Sergeant Stewart to ban Coley-Pearson from the property, Coley-Pearson returned to the polling site that same day to assist another voter. The police were called again, and Sergeant Stewart returned to the polling site. Sergeant Stewart issued Coley-Pearson a criminal trespass warning, which Coley-Pearson admits was "drafted and issued" by Sergeant Stewart. According to Martin's declaration, Martin "left it entirely up to the city officers as to the scope, breadth[,] and duration of the criminal trespass warning and did not participate in any way with drafting the trespass warning." Indeed, Sergeant Stewart testified that the language in the trespass warning "entirely came from [him]."

The warning, issued by Sergeant Stewart on behalf of the City of Douglas Police Department, said that Coley-Pearson was banned from "any polling place that is controlled by the Coffee County Board of Elections during the time of voting or any other Board of Elections business" due to "disruptive behavior." The ban "include[d] property not at [the polling location] but being lawfully

used by the board." The warning explained that Coley-Pearson could "come to a polling place in order to vote[,] [but that] she ha[d] already cast her ballot for [that] year[']s election." The warning defined the ban as "indefinite" and noted that Coley-Pearson would "be subject to arrest" if she violated the warning. Finally, the warning stated that Coley-Pearson "was told that she was banned by elections supervisor Misty Martin."[5]

After receiving the trespass warning, Coley-Pearson refused to leave the premises despite being told to do so. A video of the arrest shows that rather than leaving when the officers told her to, Coley-Pearson argued with them about the merits of the trespass warning. The video also shows Martin being asked whether, as the person in control of the property, she wanted Coley-Pearson to leave and be arrested if she refused. Martin responded affirmatively, and shortly after Martin's response, the police arrested Coley-Pearson. Notably, Sergeant Stewart testified in his deposition that the decision to arrest Coley-Pearson "rested entirely with [him]."

### B.    Procedural History

Coley-Pearson sued Martin and Coffee County under 42 U.S.C. § 1983.[6] Relevant here, she alleged that the criminal trespass warning issued by Sergeant Stewart violated the First Amendment

---

[5] The ban was dropped after the start of this litigation.

[6] She also sued the City of Douglas and the City of Douglas police officers involved in her arrest, but she ultimately dismissed her claims against them.

because the warning (1) prevented her from continuing to help voters at Coffee County polling sites, (2) was unconstitutionally vague, and (3) was a prior restraint issued in Martin and the County's unbridled discretion. She also alleged a claim for false arrest in violation of the Fourth Amendment.[7]

After discovery, Martin and Coffee County moved for summary judgment. The district court granted the motion, "find[ing] dispositive that [Martin and Coffee County] did not draft or issue the Criminal Trespass Warning" or arrest Coley-Pearson. Starting with the First Amendment claim, the district court observed that Coley-Pearson did not challenge Martin and Coffee County's decision to remove her from the polling location, but instead challenged only the criminal trespass warning itself. Because the criminal trespass warning "was neither drafted nor issued" by Martin, and because Coley-Pearson failed to show that the warning was "a policy of the County or an unofficial custom or practice of the County," the district court granted summary judgment on the First Amendment claim.[8]

---

[7] Additionally, Coley-Pearson's complaint alleged claims for First Amendment retaliation and malicious prosecution in violation of the Fourth Amendment. She does not address these claims in her opening brief on appeal. She has therefore abandoned these claims. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014).

[8] The district court "wrestled with" the merits of Coley-Pearson's First Amendment arguments "[f]or the sake of thoroughness." The parties raise some of these issues on appeal. Because we conclude that the district court

The district court also granted summary judgment on Coley-Pearson's Fourth Amendment false-arrest claim. The court observed that City of Douglas police officers, rather than Martin, made "the ultimate decision" to arrest Coley-Pearson. Further, the court found that Sergeant Stewart, rather than relying entirely on Martin's story, conducted an independent investigation before making the arrest. The court therefore found that the false arrest claim failed because Coley-Pearson did not "show an affirmative causal connection between . . . Martin's actions and [Coley-Pearson's] arrest."

Coley-Pearson timely appealed.

## II.    Standard of Review

"We review de novo the grant of summary judgment and construe the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party." *Ziegler*, 831 F.3d at 1318. "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "The determinative inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

---

properly granted summary judgment for reasons unrelated to these alternative arguments, we do not address them here.

### III.    Discussion

On appeal, as relevant here, Coley-Pearson argues that the district court erred in granting summary judgment to the defendants on both her First and Fourth Amendment claims under § 1983.  Starting with the First Amendment, Coley-Pearson argues that because Martin—who was allegedly acting as a final policymaker for Coffee County—requested some sort of ban of Coley-Pearson, Martin and Coffee County proximately caused Sergeant Stewart to issue the criminal trespass warning banning Coley-Pearson from polling sites controlled by the Coffee County Board of Elections.  As for the Fourth Amendment, Coley-Pearson contends that Martin is liable for her arrest because Martin "direct[ed] the unlawful order that was the sole basis for [her] arrest, explicitly request[ed] the arrest, and provid[ed] false facts that underpinned the arrest."  We disagree with Coley-Pearson on both fronts.  Martin—and through her, the County—did not cause the criminal trespass warning or the arrest.  We therefore affirm.

"A § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation."  *Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1165 (11th Cir. 2005).  "Section 1983 thus focuses our inquiry on whether an official's acts or omissions were the cause—not merely a contributing factor—of the constitutionally infirm condition."  *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993).  An independent intervening cause can cut off a causal relationship.  *Troupe*, 419 F.3d at 1165–66.  Relevant here, we have explained that a "causal relation does not exist when the continuum between [the]

[d]efendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers." *Dixon v. Burke Cnty.*, 303 F.3d 1271, 1275 (11th Cir. 2002).

This case thus turns on whether Martin—acting as the Coffee County Elections Supervisor—caused Sergeant Stewart to issue the criminal trespass warning and arrest Coley-Pearson, or whether Sergeant Stewart, in issuing the warning and arresting Coley-Pearson, acted as a "deliberative and autonomous decision-maker[]" breaking the chain of causation between Martin's actions and Coley-Pearson's injuries. *Id.* As explained below, we conclude that, on these facts, there is no genuine dispute as to whether Sergeant Stewart acted as a "deliberative and autonomous decision-maker[]" when issuing the criminal trespass warning and arresting Coley-Pearson. *Id.* He did. Coley-Pearson's First and Fourth Amendment claims thus both fail for lack of causation.

We begin our analysis by explaining how to determine whether a deliberative, autonomous actor breaks the chain of causation between a defendant's actions and a plaintiff's injuries. We then apply the law to the facts here.

> A.    *The intervening actions of a deliberative, autonomous decisionmaker break the chain of causation between a defendant's actions and the plaintiff's injuries*

Two of our previous decisions guide our analysis of how to determine whether a deliberative, autonomous actor breaks the chain of causation between a defendant's actions and the plaintiff's injuries. We begin with our decision in *Dixon*. There, a district

23-13249                Opinion of the Court                13

attorney recommended that a 19-person grand jury charged with replacing a deceased member of the county school board pick "someone who [was] the same race and gender as the Board member who passed away"—*i.e.*, a white male. 303 F.3d at 1273. The grand jury foreman subsequently recommended that a specific white male be chosen, and the grand jury agreed. *Id.* at 1274. A state judge then "made the ultimate decision" to appoint the chosen applicant to the school board. *Id.* The plaintiff, a white female who had applied for the vacant spot on the school board, then filed a § 1983 equal-protection suit against the district attorney, the grand jury foreman, and the county, arguing that they were liable for the ultimate decision to select the white male for the job. *See id.*

Affirming the district court's grant of summary judgment to the defendants, we held that neither the grand jury foreman nor the district attorney caused the plaintiff's harm. *Id.* at 1275. As to the grand jury foreman, we explained that "the acts of various other parties"—*i.e.*, the other grand jurors who also voted on the applicant and the state court judge who approved the applicant— "destroy[ed] any causal link" between the foreman's recommendation and the selection of the new board member. *Id.* The foreman did not "coerce[]" or "exercise[] extraordinary influence over" the other grand jurors. *Id.* Nor did he "deprive[] [them] of their individual freedom of choice" or make the others become "an extension of" himself. *Id.* Instead, "the [g]rand [j]ury was given *free* opportunity to nominate" someone other than the white male initially nominated by the foreman. *Id.* That the grand

jury chose not to do so did not make the foreman the "cause" of the ultimate selection of the white male. *Id.*

We reached the same conclusion with respect to the district attorney who made the recommendation that a white male be chosen. *See id.* We explained that the district attorney "did not vote on any applicant nor did he force the [g]rand [j]ury into an improper gender-motivated selection." *Id.* "He merely advised them" that selecting a white male would avoid political controversy. *Id.* The connection between the district attorney's words and the ultimate selection "[was] severed by the intervening free, independent, and volitional acts of the [g]rand [j]ury and the state [j]udge." *Id.* At bottom, the grand jury "understood that it did not have to accept" the district attorney's advice. *Id.* We thus found causation lacking.[9] *See id.*; *see also Carruth v. Bentley*, 942 F.3d 1047, 1056 (11th Cir. 2019) (affirming dismissal of a complaint for lack of causation where the plaintiff alleged that the Governor of Alabama and his legal advisor caused the plaintiff's employer to be placed into conservatorship, but the plaintiff failed to make any "allegations that impugn[ed] or otherwise undermine[d] the independence" of the members of an administrative board that made the ultimate conservatorship decision; in other words, the

---

[9] We also found in *Dixon* that the county was not liable for the actions of the grand jurors because there was not "a sufficient showing that any member of the [g]rand [j]ury, *other* than [the foreman], may have been improperly motivated by gender considerations, as opposed to the substantive merits of the applicants." 303 F.3d at 1276. Instead, "[a] jury would have to resort to pure speculation as to why the other grand jurors acted as they did." *Id.*

board members "s[at] in the middle of the causal chain allegedly running from [the defendants] to [the plaintiff's] injuries").

Our decision in *Brown v. City of Huntsville* is also instructive. 608 F.3d 724 (11th Cir. 2010). There, a plaintiff sued, among others, two officers for false arrest under the Fourth Amendment. *Id.* at 736. But the officers that the plaintiff sued were not the officers that actually arrested the plaintiff. *See id.* at 736–37. Applying § 1983 causation principles, we found that the plaintiff sued the wrong officers. *See id.* We explained that even though one of the non-arresting defendant officers explicitly told the arresting officer to arrest the plaintiff, the defendant officer was outside the chain of causation because he "was [not] part of the chain of command authorizing the arrest action" and had "no active personal participation" in the arrest. *Id.* at 737. "At most," the plaintiff had shown that the non-arresting defendant officer "arguably *wanted* [the arresting officer] to arrest [the plaintiff]." *Id.* But merely wanting an officer to arrest someone—and telling the officer to do that—was not enough to establish § 1983 causation for the false-arrest claim. *See id.*

*Dixon* and *Brown* show that, when it comes to causation under § 1983, the overarching rule is that where a "deliberative, autonomous decision-maker[]" stands between a defendant's actions and the plaintiff's injuries, the defendant's actions cannot be the cause of the plaintiff's injuries under § 1983. *Dixon*, 303 F.3d at 1275. Instead, in such a case, the intervening actor breaks the chain of causation.

Importantly, though, the "deliberative, autonomous decision-maker" must be just that: "deliberative" and "autonomous." *Id.* The intervening actor must retain his "individual freedom of rational choice" and act according to his "individual free will" for the causal chain to be broken. *Id.* Put differently, so long as there is nothing "impugn[ing] or otherwise undermin[ing] the independence" of the intervening actor, the plaintiff cannot say that the defendant—through the intervening actor—caused the plaintiff's injuries. *See Carruth*, 942 F.3d at 1056.

That said, there are many ways to show that an intervening actor has not acted deliberatively and autonomously and therefore has not broken the causal chain between the defendant's actions and the plaintiff's injuries. We offer a few examples here. To begin, an intervening actor does not act deliberatively and autonomously if the defendant "coerce[s]" or "exercise[s] extraordinary influence over" the actor. *Dixon*, 303 F.3d at 1275. Nor does the intervening actor act deliberatively and autonomously if the defendant "deceive[s]" or "unduly pressure[s]" him to take the complained-of action. *See Barts v. Joyner*, 865 F.2d 1187, 1197 (11th Cir. 1989). Moreover, if the defendant "active[ly]" and "personal[ly]" participates in the action causing the plaintiff's injuries, or if the intervening actor acts in response to a request from a defendant within the actor's "chain of command," deliberativeness and autonomy are also absent. *Brown*, 608 F.3d at 737; *see also Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (explaining that supervisors in the defendant's chain of command are liable for acts that they direct their subordinates to take). And lastly, the

intervening actor does not act deliberatively and autonomously if he "relie[s] entirely on [the defendant's] story" and "[does] not further investigate [an] incident" before taking action. *See Jordan v. Mosley*, 487 F.3d 1350, 1353–57 (11th Cir. 2007) (explaining that "[i]n this Circuit, a non-arresting officer who instigates or causes an unlawful arrest can still be liable under the Fourth Amendment" under certain circumstances); *see also Carter v. City of Melbourne*, 731 F.3d 1161, 1170 (11th Cir. 2013) (finding chain of causation between the individual defendants' actions and the plaintiff's arrest broken where law enforcement "conducted its own investigation and independently decided to arrest" the plaintiff, and the individual defendants did not "knowingly supply[] false information to [law enforcement] or plac[e] undue pressure" on them).

With these principles in mind, we conclude where we began: Where a "deliberative, autonomous decision-maker[]" stands between a defendant's actions and the plaintiff's injuries, the defendant's actions are not the cause of the plaintiff's injuries under § 1983. *Dixon*, 303 F.3d at 1275. Whether the intervening actor acts deliberatively and autonomously depends on the facts of each case. And the key question in the analysis is whether the intervening actor retained his "individual freedom of rational choice" and acted according to his "individual free will." *Dixon*, 303 F.3d at 1275. If so, the intervening actor's decisions and actions break the causal chain that would otherwise exist between the defendant's actions and the plaintiff's injuries. *See id.*; *Brown*, 608 F.3d at 737. If not, then whatever causal chain there is between the defendant and the plaintiff remains.

We now turn to analyzing whether, on the facts of this case, Sergeant Stewart—the intervening actor—broke the causal chain between Martin's actions and Coley-Pearson's claimed injuries.

> B.      *Sergeant Stewart broke the chain of causation between Martin's actions and Coley-Pearson's injuries*

Under *Dixon* and *Brown*, we conclude that Coley-Pearson has failed to establish that Martin—and through Martin, the County—caused her alleged injuries. Instead, Sergeant Stewart's deliberative, autonomous decision-making broke any chain of causation.

We begin with Coley-Pearson's First Amendment claim. To state the obvious, neither Martin nor the Board of Elections nor the County wrote or issued the criminal trespass warning. Sergeant Stewart, a City of Douglas police officer, did. True, Martin asked Sergeant Stewart to ban Coley-Pearson from the polling site. But Sergeant Stewart testified that the language in the criminal trespass warning came "entirely came from [him]." And Sergeant Stewart did not "rel[y] entirely on [Martin's] story" as the basis for issuing the criminal trespass warning. *Jordan*, 487 F.3d at 1353. Instead, he issued the criminal trespass warning only after conducting an independent investigation and speaking with nine witnesses excluding Martin. Because Sergeant Stewart acted deliberatively and autonomously in issuing the criminal trespass warning, he broke any chain of causation between Martin's actions

23-13249                Opinion of the Court                19

and the criminal trespass warning.  *See Dixon*, 303 F.3d at 1275; *Brown*, 608 F.3d at 737.[10]

      For similar reasons, Coley-Pearson has also failed to show that Martin and the County caused her arrest.  Sergeant Stewart testified that the decision to arrest Coley-Pearson "rested entirely with [him]."  To be sure, the video of the arrest shows Martin being asked whether, as the person in control of the property, she wanted Coley-Pearson to leave and be arrested if she refused.  Martin responded affirmatively.  But Martin's confirming to the police that she wanted Coley-Pearson to be arrested for trespass does not alter the fact that Sergeant Stewart arrested Coley-Pearson based on his own free will and judgment, after seeing with his own eyes that Coley-Pearson was refusing to comply with the trespass warning. *See Brown*, 608 F.3d 736–37 (finding lack of causation for false arrest even where defendant officer explicitly told the arresting officer to

---

[10] We recognize that Martin's request for a criminal trespass warning was necessary for Sergeant Stewart to issue the warning.  *See* O.C.G.A. § 16-7-21(b)(3) (providing that a person commits trespass when, as relevant here, the person "knowingly and without authority . . . [r]emains upon the land or premises of another person . . . after receiving notice from . . . an authorized representative of the owner or rightful occupant to depart.").  But just because Martin's request was necessary for the warning to issue does not mean that Sergeant Stewart's issuance of the warning was not deliberative and autonomous.  When Martin requested that Coley-Pearson be trespassed from the property, Sergeant Stewart had two options: (1) issue the trespass warning, or (2) refuse to issue the warning.  As the undisputed record reflects, he autonomously and deliberatively chose the former option after conducting his own investigation.  Therefore, he broke the causal chain between Martin's request and the ultimate issuance of the trespass warning.

arrest the plaintiff).  A causal link between Martin's actions and Coley-Pearson's arrest is thus also lacking.

Sergeant Stewart's "intervening free, independent, and volitional acts" severed any connection between Martin's actions and the trespass warning and arrest. *Dixon*, 303 F.3d at 1275.  There is no genuine dispute as to whether Martin "coerced" Sergeant Stewart into doing anything or whether she "exercised extraordinary influence over" Sergeant Stewart at any point. *Id.* She did not.  And Martin was nowhere in any "chain of command" requesting either action that Coley-Pearson complains of. *Brown*, 608 F.3d at 737.  Sergeant Stewart testified that both the language in the trespass warning and the arrest came "entirely" from him—not Martin.  We therefore conclude that Sergeant Stewart "understood that [he] did not have to accept" any of Martin's requests, *Dixon*, 303 F.3d at 1275, and that both the criminal trespass warning and the arrest resulted not from Martin's actions, but from Sergeant Stewart's "individual freedom of rational choice," *id.*

Coley-Pearson resists this conclusion by claiming that, instead of acting deliberatively and without coercion, Sergeant Stewart was manipulated by Martin.  According to Coley-Pearson, Martin "falsely claimed a disruption," which led to the criminal trespass warning, and Martin "provid[ed] false facts that underpinned [Coley-Pearson's] arrest."  But even at the summary-judgment stage, the record does not support Coley-Pearson's assertions.

First, Coley-Pearson herself admitted in her deposition that she "yelled" and "raised [her] voice" during her encounter with Martin inside the polling site. And no witness that Sergeant Stewart spoke to during his investigation contradicted Martin's claim that Coley-Pearson was part of a disturbance. So, it is hard to see how Martin "falsely claimed a disruption" so that the criminal trespass warning would be issued.

Second, it is unclear what "false facts . . . underpinned" Coley-Pearson's arrest. Coley-Pearson was arrested for violating the criminal trespass warning, which Sergeant Stewart saw with his own eyes. And to the extent that Coley-Pearson argues that Martin falsely claimed that she felt threatened because Coley-Pearson got in her face, that argument likewise fails. As Coley-Pearson points out, Martin told Sergeant Stewart: "I don't care what I got to file, what I got to do, she is not to come back in my office. If I have to say I feel threatened, I don't care." But notably, when discussing Martin's conversation with Sergeant Stewart, Coley-Pearson's briefing on appeal repeatedly omits the very next sentence in the conversation: "Because I do . . . she was all up in my face." Coley-Pearson points to no record evidence contradicting Martin's statement that Coley-Pearson was "all up in [her] face." So, again, Coley-Pearson has failed to show that Martin provided "false facts" that "underpinned" Coley-Pearson's arrest. Thus, the evidence in the record does not create a genuine dispute as to whether Martin lied to or manipulated Sergeant Stewart.

Beyond claiming that Martin lied to Sergeant Stewart, Coley-Pearson does not grapple with our holdings in *Dixon* and *Brown*.[11]  Instead, Coley-Pearson points to case law that recites the general principle that "defendants are . . . responsible for the natural and foreseeable consequences of their actions," as well as the actions of foreseeable intervening actors.  *See Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000).  According to Coley-Pearson, once Martin asked for both the trespass warning and the arrest, it was foreseeable that both those things would occur.  Causation, she argues, is therefore allegedly satisfied.

Coley-Pearson's reliance on the general foreseeability principle fails.  It is true that, generally, defendants are liable for the "natural and foreseeable consequences of their actions."  *Id.*  But as our cases have explained, that general principle is overcome where, as here, a third party's deliberative, independent, and autonomous decision-making—free from the defendant's coercion, deception, manipulation, and the like—stands between the defendant's actions and the plaintiff's alleged harms.  *See Dixon*, 303 F.3d at 1275; *Brown*, 608 F.3d at 737.

To be sure, there is some "tension [between] the principle that the intervening exercise of independent judgment will break a causal chain, and the principle that defendants in section 1983 cases are liable for consequences caused by reasonably foreseeable intervening forces."  *Zahrey v. Coffey*, 221 F.3d 342, 351 (2d Cir. 2000)

---

[11] Indeed, neither her opening brief nor her reply brief even cites *Dixon* or *Brown*.

23-13249                Opinion of the Court                23

(quotation and citation omitted).  But numerous courts, including ours, have "resolve[d] the tension by considering the intervening act of a decision-maker" to be "reasonably foreseeable" only where the intervening act is "not . . . an exercise of truly independent judgment."  *Id.* at 351–52 (emphasis added) (collecting cases).  As discussed above, one example of when an intervening act is not "an exercise of truly independent judgment" is a situation in which the act is "*caused by pressure or misleading information* provided by the actor whom the plaintiff seeks to hold liable."  *Id.*; *see also Barts*, 865 F.2d at 1197 (explaining that officers who made an improper arrest were not liable for everything that happened after the arrest unless "the police officers deceived the court officials or unduly pressured them or that the court officials themselves acted with malice and the police joined with them").  Another example is a situation in which the defendant coerces or exercises "extraordinary influence" over the intervening actor.  *Dixon*, 303 F.3d at 1275.

Here, as discussed above, there is no genuine dispute as to whether Martin "unduly pressured," "deceived," coerced, or misled Sergeant Stewart in any way.  *See Barts*, 865 F.2d at 1197; *Dixon*, 303 F.3d at 1275.  She did not.  Instead, Sergeant Stewart exercised his free, independent will and judgment when issuing the criminal trespass warning and arresting Coley-Pearson.  He investigated before issuing the trespass warning.  *See Carter*, 731 F.3d at 1170 (finding chain of causation between the individual defendants' actions and the plaintiff's arrest broken where law enforcement "conducted its own investigation and independently decided to arrest" the plaintiff, and where the individual defendants did not

24                    Opinion of the Court                    23-13249

"knowingly supply[] false information to [law enforcement] or plac[e] undue pressure" on them).  He saw with his own eyes that Coley-Pearson was violating that trespass warning, which led to her arrest.  And he testified, without record evidence showing otherwise, that both the language in the criminal trespass warning and Coley Pearson's arrest rested "entirely" with him.  At best, then, Sergeant Stewart—not Martin—caused Coley-Pearson's alleged injuries.[12]

Because there is no genuine dispute that Sergeant Stewart acted as anything other than a deliberative and autonomous decision-maker in issuing the criminal trespass warning and arresting Coley-Pearson, Coley-Pearson has failed to establish the required causal link between Martin's actions and her complained-of injuries. *Dixon*, 303 F.3d at 1275.  Both of Coley-Pearson's § 1983 claims against Martin thus fail, and we affirm the district court's grant of summary judgment to Martin.

And because we find that the claims against Martin fail, the claims against the County also necessarily fail.  Coley-Pearson claims that the County is liable for Martin's actions because Martin, in her capacity as the Coffee County Elections Supervisor, acted as a final policymaker for the County in causing Sergeant Stewart to

---

[12] We emphasize that a government actor cannot automatically insulate himself from liability merely by directing a third party to take an action instead of taking that action himself.  Rather, it is only when the third party acts "deliberative[ly]" and "autonomous[ly]" that the third party breaks the chain of causation. *Dixon*, 303 F.3d at 1275.  Our discussion above explores how to make this determination based on the facts of each case.

issue the criminal trespass warning and to arrest Coley-Pearson.[13] We have explained that a plaintiff can establish a governmental entity's liability by, among other things, "identifying a [government] official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *See Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022). However, a governmental entity cannot be held liable "based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

We assume without deciding that Martin acted as a final policymaker for Coffee County, for even if she did, the district court properly granted summary judgment to the County. As discussed, Martin caused neither the issuance of the criminal trespass warning nor Coley-Pearson's arrest—in other words, she "inflicted no constitutional harm." *Id.* Thus, the County cannot be held liable based on Martin's actions. *See id.* We therefore affirm the district court's grant of summary judgment to the County.

### IV.    Conclusion

For these reasons, the district court's grant of summary judgment to Martin and Coffee County is affirmed.

**AFFIRMED.**

---

[13] Of course, Sergeant Stewart's independent actions cannot give rise to liability for Coffee County because Sergeant Stewart acted on behalf of the City of Douglas, not Coffee County.